Barbara GEIBE, petitioner, Appellant,

v.

Ma Donna GEIBE, Respondent.

No. C1–97–1098.

Court of Appeals of Minnesota.

Dec. 2, 1997.

Timothy L. Warnemunde, Montgomery, for Appellant.

Michael Ormond, Ormond Law Offices, Minneapolis, for Respondent.

Considered and decided by WILLIS, P.J., and SCHUMACHER and FOLEY, * JJ.

## OPINION

WILLIS, Judge.

Barbara Geibe appeals the district court's denial, without an evidentiary hearing, of her petition for custody of her deceased husband's 17–year–old daughter and visitation with her husband's other children. We affirm.

## FACTS

The marriage of Charles and respondent Ma Donna Geibe (Ma Donna) was dissolved in 1994. In 1995, Charles married appellant Barbara Geibe (Barbara). Charles died on January 23, 1997.

Charles and Ma Donna had a daughter, F.G., born March 5, 1980, and two younger sons, C.J.G. and A.G. The parents agreed to joint legal custody at the time of the dissolution, but disputed physical custody. The court granted physical custody of all three children to Ma Donna and granted Charles visitation on alternate weekends, certain holidays, half of winter and spring school vacations, and six weeks during summer vacation. Barbara asserts that she acted as primary caretaker during these periods and that she developed a close relationship with all three children, who call her "Mom."

Two months after Charles's death, Barbara filed a petition seeking custody of F.G. and visitation with the boys (and with F.G. if denied custody) on approximately the schedule Charles had been granted. Barbara alleges by affidavit that since Charles's death, Ma Donna has refused to permit the children to visit her or any of their paternal relatives. F.G.'s affidavit corroborates this claim, adding that her mother emotionally injured her

by "verbally berating" her, regularly saying she was "too fat," and insulting her with increasing regularity since the death of her father. She also claims that in 1997 her mother physically assaulted her for the first time, on one occasion pushing her onto a bed, slapping her, and pulling her hair.

Ma Donna's affidavit characterizes the issue as a conflict between a headstrong 17–year–old and a religious, fairly strict mother, saying that F.G. found Barbara's home an attractive alternative because of her more liberal lifestyle. She also indicates a belief that Barbara has promised F.G. a share of Charles's life insurance proceeds for college if F.G. comes to live with her. Ma Donna denies ever insulting F.G. or calling her "too fat," noting that she, as a school nurse, regularly deals with teenagers with eating disorders. She also denies any intent to cut the children off from their paternal relatives.

Ma Donna admits to a physical confrontation with F.G. shortly before Charles's death, following 24 hours of arguments resulting from Ma Donna's refusal to allow F.G. to attend a house party with boys and no parents present. Ma Donna alleges that after the refusal, F.G. snuck out of the house and went to the home of a paternal relative, returning home only after a deputy sheriff was called in. The next morning, F.G. refused to attend church. Ma Donna continues,

> [F.G.] knows that in our house Sunday church participation is expected. She started to get angry with me and started using foul language. I grabbed her T-shirt on the shoulder and pulled her toward me, telling her that I didn't appreciate her language. When the language continued, I covered her mouth with my hand. She bit me and pounded me several times on my upper arm. We struggled and she fell onto the bed on her side, continuing to swear at me. I'm embarrassed to say that I slapped her once on the buttocks. We were both upset and out of control. * * *

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

To the best of my knowledge, I did not pull her hair.

The district court dismissed Barbara's petition without an evidentiary hearing, determining that Barbara had failed to state a prima facie case of endangerment to F.G. as required by Minn.Stat. § 518.18(d) and that she was not entitled to common-law stepparent visitation rights. Barbara appeals, and Ma Donna seeks payment of her attorney fees on appeal. We affirm the district court's decision and deny Ma Donna's request for fees.

## ISSUES

1. Did the district court err in finding that Barbara failed to establish a prima facie case of endangerment sufficient to require an evidentiary hearing on modification of custody?

2. Did the district court err in holding that Barbara is not entitled to stepparent visitation under Minnesota common law?

## ANALYSIS

### I. Custody modification

Under Minnesota law,

the court shall not modify a prior custody order unless it finds, upon the basis of facts * * * that have arisen since the prior order or that were unknown to the court at the time of the prior order, that a change has occurred in the circumstances of the child or the parties and that the modification is necessary to serve the best interests of the child. In applying these standards the court shall retain the custody arrangement established by the prior order unless:

* * *

(iii) the child's present environment endangers the child's physical or emotional health or impairs the child's emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child.

Minn.Stat. § 518.18(d) (1996).

◼ The party seeking a modification of custody must submit an affidavit asserting the facts on which the motion is based.

Minn.Stat. § 518.185 (1996). The court must determine whether the petitioner has established a prima facie case by alleging facts that, if true, would provide sufficient grounds for a modification. *Nice–Petersen v. Nice–Petersen*, 310 N.W.2d 471, 472 (Minn.1981). For purposes of this determination, the court must accept the facts in the moving party's affidavits as true, and the allegations do not need independent substantiation. *See Lilleboe v. Lilleboe*, 453 N.W.2d 721, 723–24 (Minn.App.1990) (reversing where district court dismissed on ground that moving party's abuse allegations were not corroborated). But section 518.185 grants other parties to the proceeding the right to file opposing affidavits, and the court may consider evidence from sources other than the moving party's affidavits in making its determination. *See Krogstad v. Krogstad*, 388 N.W.2d 376, 383 (Minn.App.1986) (upholding dismissal for failure to make out prima facie case where children's behavior problems asserted in affidavit dated from visit with moving party).

◼ If the moving party asserts facts sufficient to support a modification of custody, the court must hold an evidentiary hearing to determine the truth of the allegations. *Taflin v. Taflin*, 366 N.W.2d 315, 320 (Minn.App. 1985). Evidentiary hearings are strongly encouraged where there are allegations of present endangerment to a child's health or emotional well-being. *Ross v. Ross*, 477 N.W.2d 753, 756 (Minn.App.1991).

### A. Standard of review

◼ In *Nice–Petersen*, the Minnesota Supreme Court concluded that "the trial court did not abuse its discretion in denying the motion on affidavits and in refusing to schedule an evidentiary hearing." *Nice–Petersen*, 310 N.W.2d at 472. Subsequent decisions by this court have applied an abuse of discretion standard to a district court's dismissal of a modification petition without an evidentiary hearing, relying on the court's general broad discretion in custody matters. *See, e.g., Itasca Cty. Soc. Servs. ex rel. Hall v. David*, 379 N.W.2d 700, 703 (Minn.App.1986).

Barbara relies on this court's decision in *Ross*, 477 N.W.2d at 755–56, in contending

that denial of an evidentiary hearing should be reviewed de novo. *Ross,* however, does not address the supreme court's language in *Nice–Petersen,* and this court's subsequent opinions have applied an abuse of discretion standard. *See, e.g., Smith v. Smith,* 508 N.W.2d 222, 227 (Minn.App.1993); *Weiler v. Lutz,* 501 N.W.2d 667, 671 (Minn.App.1993), *aff'd, Valentine v. Lutz,* 512 N.W.2d 868, 872 (Minn.1994); *Abbott v. Abbott,* 481 N.W.2d 864, 868 (Minn.App.1992). Moreover, the supreme court applied an abuse of discretion standard in affirming this court's *Weiler* decision. *Valentine,* 512 N.W.2d at 872. Because *Nice–Petersen* and *Valentine* indicate that the supreme court intends that an abuse of discretion standard apply, we apply that standard here.

## B. Standards for custody modification

### 1. General standards

■ The moving party must establish four elements for a prima facie case: (1) a change in the circumstances of the child or custodian; (2) that a modification would serve the best interests of the child; (3) that the child's present environment endangers her physical or emotional health or emotional development; and (4) that the harm to the child likely to be caused by the change of environment is outweighed by the advantage of change. *Abbott,* 481 N.W.2d at 868. The standard is the same whether the moving party is a parent or non-parent. *Westphal v. Westphal,* 457 N.W.2d 226, 228 (Minn.App. 1990).

■ A change in circumstances must be significant and must have occurred since the original custody order; it cannot be a continuation of conditions existing prior to the order. *Roehrdanz v. Roehrdanz,* 438 N.W.2d 687, 690 (Minn.App.1989), *review denied* (Minn. June 21, 1989). The best interests of the child are determined according to the factors listed in Minn.Stat. § 518.17 (1996). *Abbott,* 481 N.W.2d at 867. Endangerment requires a showing of a "significant degree of danger," *Ross,* 477 N.W.2d at 756, but the danger may be purely to emotional development. *See Eckman v. Eckman,* 410 N.W.2d 385, 389 (Minn.App.1987) (upholding sufficiency of evidence for modification based on

child's isolation in father's home and preference for mother). The fourth factor, the balance of harms, may sometimes be implicit in the other factors. *See id.* (upholding modification where explicit findings on advantage of change not made).

### 2. Effect of a teenaged child's preference

■ A child's preference has been found relevant to three of the four modification factors. A child's strong preference to change residence after a custody decree can constitute a change in circumstances. *Eckman,* 410 N.W.2d at 388. The child's "reasonable" preference is also one of the statutory factors for the court to weigh in determining a child's best interests. Minn. Stat. § 518.17, subd. 1(a)(2) (1996).

Where the child is a teenager, Minnesota courts have taken preferences into account in determining emotional endangerment. A line of decisions early in this century allowed teenagers to remain with the non-parents with whom they resided, noting the dubious practicality of ordering a teenager to live where she does not want to live and the independent damage to a child's psyche from the "imaginary" wrong of having her preference overruled. *See, e.g., State ex rel. Feeley v. Williams,* 176 Minn. 193, 196, 222 N.W. 927, 928 (1929). This court in *Ross* placed particular emphasis on the preference factor, terming it "an overwhelming consideration." *Ross,* 477 N.W.2d at 756.

■ Preferences may provide sufficient evidence for a district court, in its discretion, to order an evidentiary hearing, as in *Eckman.* However, preferences alone do not provide sufficient evidence of endangerment to mandate a hearing. *See, e.g., Lundell v. Lundell,* 387 N.W.2d 654, 658 (Minn.App. 1986). Moreover, the court may deny a hearing where it is obvious from the record that a child's stated preference results from manipulation by the moving party. *See Roehrdanz,* 438 N.W.2d at 690–91. In general, however, the case law indicates that a child's motives for an expression of preference are to be considered at the evidentiary hearing stage rather than in determining

whether a prima facie case has been made. *See Ross,* 477 N.W.2d at 757 (remanding for hearing despite affidavit asserting that child's preference resulted from desire to live with more lenient parent).

## C. Application of standard in this case

Barbara's and F.G.'s affidavits state four grounds for modification: (1) F.G.'s preference, (2) Ma Donna's refusal to permit contact with paternal relatives, (3) F.G.'s fight with Ma Donna in January 1997, and (4) emotional abuse by Ma Donna. We are required to accept these allegations as true, *see, e.g., Abbott,* 481 N.W.2d at 868; thus, we must disregard any directly contrary statements in Ma Donna's affidavit. But under *Krogstad,* we may take note of statements in Ma Donna's affidavit that explain the circumstances surrounding the accusations. 388 N.W.2d at 383.

### 1. Changed circumstances

All of F.G.'s allegations relate to conditions mentioned in the dissolution judgment. But although the original custody order mentioned that Ma Donna had kept her children from contact with her in-laws, there is no claim here that she did so between the final dissolution of the marriage and Charles's death. Ma Donna's alleged resumption of her former practice of preventing F.G. from seeing her paternal relatives therefore qualifies as a change in circumstances. Moreover, although F.G. stated at one point during the dissolution process that she preferred to live with Charles, she changed her mind before the final custody order; thus, under *Eckman,* her new preference meets this requirement as well. F.G.'s allegations of physical and emotional abuse represent a closer case, as they amount to escalations of ongoing conflicts between F.G. and her mother. Because we find that F.G. has not established a sufficient case of endangerment to justify a modification of custody under the circumstances, we need not decide whether these escalations are significant enough in degree to meet the changed circumstances requirement.

### 2. Endangerment

As noted, a teenager's choice by itself is generally not sufficient evidence of endangerment to require an evidentiary hearing. In *Ross,* 477 N.W.2d at 754, and in *Edsten v. Edsten,* 407 N.W.2d 102, 103 (Minn.App.1987), the child had already moved in with the parent seeking custody, and evidence showed improvements in school performance and disposition since that time. The record in *Ross* also included a psychologist's affidavit. 477 N.W.2d at 754. In *Eckman* the court found, based on the child's testimony at the evidentiary hearing, that the child felt isolated as a result of "extremely limited" interaction with his custodial father and the father's girlfriend. *Eckman,* 410 N.W.2d at 389.

The other injuries F.G. has alleged might, in combination with her preference, create a prima facie case of endangerment. This court has consistently held that emotional abuse alone may constitute sufficient endangerment. *See, e.g., Harkema v. Harkema,* 474 N.W.2d 10, 14 (Minn.App.1991) (reversing denial of hearing where stepfather abusive by yelling at stepsons, calling them stupid and dumb, and calling wife and boys' father names, as well as throwing things, hitting walls, and driving "like a maniac"). We note, however, that F.G.'s allegations are in the main extremely non-specific and do not rise to the level of the allegations in *Harkema.*

While physical abuse obviously endangers a child, Ma Donna's account of her January 1997 fight with F.G. is not inconsistent with F.G.'s charge (except for the allegation of hair-pulling). An alleged single incident of borderline abuse or neglect has been held not to constitute sufficient endangerment to warrant a custody modification. *See Smith,* 508 N.W.2d at 227 (insufficient endangerment where child was injured by fallen cuckoo clock and mother allegedly examined clock before child). Under the circumstances, the court did not abuse its discretion in giving this incident little weight.

This court has been inconsistent in categorizing a custodial parent's efforts to isolate the child from relatives. *Compare Westphal,* 457 N.W.2d at 229 (holding mother's cutting

off contact with grandparents to be best interests consideration, but not evidence of endangerment) *with Smith*, 508 N.W.2d at 227 (stating that a "custodial parent's efforts to undermine the children's relationship with the non-custodial parent may endanger the children," but finding evidence too vague and speculative). Repeated, concrete efforts to prevent contact, such as F.G. alleges here, could reasonably impact emotional health. We agree with the district court, however, that even in combination with F.G.'s preference and other charges, the impact is insufficient to support a modification of custody under all the circumstances of this case.

### 3. Balance of harms

■ Minnesota law rests on a presumption that stability of custody is in a child's best interests. *Westphal*, 457 N.W.2d at 229. In cases involving teenagers' preferences, Minnesota has generally endorsed the child's preference when the child sought to remain in his or her present living arrangement or to return to a previous long-term custodial arrangement. *See, e.g., Ross*, 477 N.W.2d at 756–57 (teenager had moved in with noncustodial parent before parent sought custody); *Edsten*, 407 N.W.2d at 104 (same, but remanded for findings of fact following evidentiary hearing); *In re Campbell's Guardianship*, 216 Minn. 113, 120–21, 11 N.W.2d 786, 790 (1943) (child wished to continue living with unrelated party after several years in their custody); *Gauthier v. Walter*, 110 Minn. 103, 105–6, 124 N.W. 634, 635 (1910) (same); *see also Feeley*, 176 Minn. at 197, 222 N.W. at 928 (child wished to return to custody of aunt who had raised her for several years).

In *Eckman*, this court upheld a transfer of custody based on a teenager's preference when the teenager still resided with the custodial parent during the pendency of the modification proceeding. 410 N.W.2d at 389. In that case, however, the teenager sought to move from his father's custody to his mother's a year after the dissolution. *Id.* at 387. The instant case is the first in which this court has been asked to use a teenager's preference as grounds to transfer custody to a non-parent with whom the child has never

resided for any length of time, and we do not believe the district court abused its discretion in finding that F.G. did not allege such severe endangerment as a result of Ma Donna's custody that even an untried arrangement would present less risk.

Our conclusion is supported by the fact that this appeal was considered in September 1997, less than six months before F.G.'s eighteenth birthday. Whatever the effect on a child of long-term exposure to conditions such as those F.G. alleges, we question whether they could impact F.G.'s emotional development so severely in the short time remaining before F.G.'s majority as to justify the delay and expense of a hearing. We therefore hold that the district court did not abuse its discretion in finding that Barbara failed to demonstrate a prima facie case for modification of custody.

### II. Visitation

■ Under Minnesota law, a child generally must have "resided in a household with" a non-parent for at least two years for the non-parent to gain a right to visitation. Minn.Stat. § 257.022, subd. 2b (1996). Barbara concedes that she has no rights under this statute, but rests her claim on *Simmons v. Simmons*, 486 N.W.2d 788 (Minn.App. 1992), in which this court recognized a common law right to visitation for stepparents who stood in loco parentis to their stepchildren, even if the relationship lasted less than two years, provided the court determined visitation to be in the child's best interests. *Id.* at 791.

The district court noted, however, that the stepfather in *Simmons* was married to the custodial parent, rather than to the noncustodial parent, and concluded that Barbara had provided "insufficient proof" that she stood in loco parentis to the children, which appears to be a determination of fact. Other states have held that, as a general matter, the determination of in loco parentis status is a fact question. *See, e.g., Drawbaugh v. Drawbaugh*, 436 Pa.Super. 57, 647 A.2d 240, 241 (1994); *cf. London Guar. & Acc. Co. v. Smith*, 242 Minn. 211, 217, 64 N.W.2d 781, 785 (1954) (holding in loco parentis status to be case-specific inquiry based primarily on

intent of parties). The issue, however, also involves a question of law as to whether stepparents whose only relationship with the children is through visitation can have in loco parentis status at all. We conclude that, as a general matter, they cannot.

■ In loco parentis literally means "in the place of a parent." The only definition of the term in Minnesota case law states:

"The term 'in loco parentis,' according to its generally accepted common-law meaning, refers to a person who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to legal adoption and embodies the two ideas of assuming the parental status and discharging the parental duties."

*London Guarantee*, 242 Minn. at 215, 64 N.W.2d at 784 (quoting *Bearhart v. United States*, 82 F.Supp. 652, 655–56 (D.Minn. 1949)). Other states using similar common-law definitions have held that stepparents do not achieve in loco parentis status merely by taking children into their homes, but also must intend to assume parental responsibilities. *See, e.g., In re Montell v. Department of Soc. and Health Servs.*, 54 Wash.App. 708, 775 P.2d 976, 978 (1989) (finding no in loco parentis status because stepparent intended to provide support for limited time, rather than indefinitely). These cases indicate that residing with a child is a necessary, but not alone sufficient, condition for an in loco parentis relationship. *See also Drawbaugh*, 647 A.2d at 241 ("a stepfather who lives with his wife and her natural children may assume the relationship of in loco parentis"); *Lipscomb v. Lipscomb*, 660 So.2d 986, 986 (Ala. 1993) ("Like stepparents, grandparents can stand in loco parentis to their grandchildren by taking them in and treating them as part of the family. * * * The in loco parentis relationship continues for as long as the grandchild lives with the grandparents * * * ."), *rev'd on other grounds, Ex parte Lipscomb*, 660 So.2d 986 (Ala.1995); *In re Marriage of Farrell*, 67 Wash.App. 361, 835 P.2d 267, 270 (1992) (finding that stepdaughter terminated in loco parentis relationship by moving out of stepfather's home); *Cava-*

*naugh v. deBaudiniere*, 1 Neb.App. 204, 493 N.W.2d 197, 206 (1992) (finding in loco parentis relationship for visitation purposes "where the stepparent and a young child have lived in a home environment and developed deep and lasting mutual bonds of affection").

We find sound practical reasons to adopt the view that common residency is a prerequisite to in loco parentis status. If there is no co-residency requirement, the defining feature of an in loco parentis relationship under *London Guarantee* becomes mere intent to assume parental responsibilities. This would allow virtually any stepparent to qualify for in loco parentis status by bringing a claim for transfer of custody in the same petition as a visitation claim, effectively exempting stepparents from the two-year co-residency requirement of Minn.Stat. § 257.022, subd. 2b. Other factors that could limit the class of stepparents in loco parentis, such as the nature and closeness of the relationship and the extent to which the stepparent took on "parental" duties during visitation, are difficult for courts to evaluate. Moreover, the legislature has specifically enumerated the classes of people who may sue for visitation; *Simmons* added one class to the list. 486 N.W.2d at 791. It makes little sense to add "visitation" stepparents while leaving out most grandparents, siblings, aunts, uncles, and the like, as well as other adults who have actually lived with the child. *Cf. Kulla v. McNulty*, 472 N.W.2d 175, 184 (Minn.App.1991) (denying visitation to mother's former lesbian partner), *review denied* (Minn. Aug. 29, 1991).

To support her contention that stepparents married to the noncustodial parent may stand in loco parentis to their stepchildren, Barbara relies on *Lundman v. McKown*, 530 N.W.2d 807 (Minn.App.1995), *review denied* (Minn. May 31, 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 814, 133 L.Ed.2d 759 (1996). *Lundman* identified a "presumption that 'custodial' stepparents (and 'visitation' stepparents during visitation) assume special-relationship duties to stepchildren" for purposes of tort liability. *Id.* at 820–21. The opinion uses "in loco parentis" interchangeably with "special-relationship," but states that "[o]ur holding is not intended to affect

the legal responsibilities of stepparents to their children in different factual situations." *Id.* at 821. Because the stepparent in *Lundman* was "custodial" (i.e., married to the custodial parent), the language regarding "visitation" stepparents is dictum; even granting the language legal weight, we are not persuaded that simply because visitation stepparents assume the duty to protect their stepchildren from harm during visitation, they are automatically in loco parentis for purposes of determining their own visitation rights.[1] Again, it is not clear when a stepparent would *not* qualify for in loco parentis status under Barbara's proposed analysis.

We therefore hold that, as a general matter, a stepparent who has resided with a child only during the child's court-ordered visitation with the noncustodial parent is not in loco parentis for purposes of *Simmons* visitation. The important factor is not to which parent the stepparent was married, but the amount of time the stepparent spends in the performance of parental duties. Some states require that a stepparent intend to assume the parental role for an indefinite period of time in order to establish an in loco parentis relationship. *See, e.g., Montell,* 775 P.2d at 978. We need not decide now whether to adopt this requirement, but we believe that a stepparent would need to stand "in the place of a parent" for considerably more time than alternate weekends and six weeks during summer vacation to be within the *Simmons* exception to Minn.Stat. § 257.022, subd. 2b.

### III. Attorney fees

 Ma Donna requests attorney fees on appeal pursuant to Minn.Stat. § 549.21,

subd. 2 (1996), which authorizes this court to grant attorney fees to a party if the adverse party has acted in bad faith or asserted a frivolous claim for the purpose of harassment and delay, and pursuant to Minn.Stat. § 518.14, subd. 1 (1996), which authorizes a grant of fees in family law actions where necessary for a party to assert its rights in good faith and where that party lacks the means to pay fees while the other party has sufficient means. Ma Donna has not provided sufficient proof of bad faith to satisfy section 549.21, and although we hold against Barbara, we do not find her claims frivolous. While Ma Donna has established a disparity in resources between Barbara and herself, she admits that she is uncertain of its extent, and we find that she has not demonstrated that a grant of fees is necessary for her to assert her rights on appeal. We therefore deny Ma Donna's motion for attorney fees.

### DECISION

For the reasons stated, we determine that the trial court did not abuse its discretion in dismissing Barbara's petition for custody without an evidentiary hearing and that Barbara, as a stepparent who has only resided with her stepchildren during court-ordered visitation periods, has no common law right to seek visitation under *Simmons.*

**Affirmed; motion for fees denied.**

---

**1.** In this state, the term "in loco parentis" has been used in determining eligibility of a stepparent for visitation, *Simmons,* 486 N.W.2d at 791; duties of protection for purposes of tort liability, *Lundman,* 530 N.W.2d at 820–21; and parental immunity from tort liability, *London Guarantee,* 242 Minn. at 215, 64 N.W.2d at 784. Other states have used the term in contexts such as eligibility for insurance benefits and liability for certain forms of child sexual abuse; in the latter context, Ohio Rev.Code Ann. § 2907.03(A)(5) (Banks–Baldwin 1996) excludes "stepparent" from the definition by listing it separately. The definition of the term is thus not always consistent, and we recognize that its scope may vary in different contexts.