*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A13-1375**

In re the Marriage of:
Jonathan Conneely, petitioner,
Respondent,

vs.

Hannah Stancek, f/k/a Hannah Conneely,
Appellant.

**Filed July 14, 2014**
**Affirmed**
**Smith, Judge**

McLeod County District Court
File No. 43-F4-04-001010

Lymari J. Santana, Mack & Santana Law Offices, P.C., LLC, Minneapolis, Minnesota (for respondent)

Kathleen M. Newman, Zachary P. Marsh, Kathleen M. Newman & Associates, P.A., Minneapolis, Minnesota; and

Brooke A. Asiatico (pro hac vice), Asiatico & Associates, Richardson, Texas (for appellant)

        Considered and decided by Halbrooks, Presiding Judge; Smith, Judge; and

Klaphake, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment under Minn. Const. art. VI, § 10.

**U N P U B L I S H E D   O P I N I O N**

**SMITH**, Judge

We affirm the district court's order granting respondent's motion to modify legal and physical custody because the district court's factual findings support its determination that circumstances had changed since the original custody decree and were not clearly erroneous. We also conclude that the district court did not abuse its discretion by considering evidence from a parallel custody proceeding, by holding appellant in constructive civil contempt for failure to pay custody evaluation fees, or by denying appellant's motion for need-based attorney fees.

## FACTS

Appellant Hannah Stancek and respondent Jonathan Conneely were married in Oklahoma in 2000. A.C. was born in 2001. In 2002, Stancek took A.C. on a visit to Minnesota to visit Stancek's family. She soon notified Conneely that she intended to remain in Minnesota, alleging that Conneely had been physically and emotionally abusive toward her. She sought orders of protection in Oklahoma and Minnesota, but only the Oklahoma district court granted her request.

Conneely filed an emergency motion in the Oklahoma district court, alleging that Stancek had permanently taken A.C. to Minnesota without his consent. The Oklahoma district court ordered Stancek to return to Oklahoma with A.C. and that A.C. be placed in Conneely's care. After Conneely told the district court that his mother would assist him in caring for A.C., Stancek reiterated claims that Conneely had abused her, adding an accusation that Conneely and his mother had an improper relationship that threatened to

2

harm A.C. An assessor determined that Conneely's mother posed no threat to A.C. In spite of that determination, Stancek continued to express fears about Conneely's relationship with his mother and potential for harm to A.C.

In late 2002, Conneely consented to A.C.'s relocation to Minnesota. Stancek had demanded this consent as a precondition to reconciliation, but she cut off all communication with Conneely after he fulfilled the precondition. As authorized by a court order, Conneely drove to Minnesota every other weekend to visit A.C.

In December 2003, Stancek sought the assistance of Dr. Sandra Hewitt to advise her regarding a parenting schedule for Conneely and to address behavioral problems that she perceived in A.C. and that she believed resulted from visits with Conneely. She told Dr. Hewitt that she was concerned about the relationship between Conneely and his mother. Dr. Hewitt did not meet or communicate with Conneely.

Stancek and Conneely divorced in March 2004, and Stancek married Nathan Stancek later that same month. By June 2004, while meeting with Dr. Hewitt, A.C. was referring to Conneely as "Oklahoma daddy" and to Nathan Stancek as "daddy."

When the Oklahoma district court dissolved Stancek and Conneely's marriage, it awarded Stancek "exclusive care, custody and control of [A.C.] subject to [Conneely's] right of reasonable visitation." It ordered a visitation schedule primarily featuring alternating weekends in Minnesota and Oklahoma.

Two months later, after a regularly scheduled visit with Conneely in Minnesota, A.C. told Stancek that she had taken a bath with her father after they had been swimming in a hotel pool together. Stancek reported the incident to Dr. Hewitt as potential sexual

3

abuse. Without consulting Conneely, Dr. Hewitt developed "guidelines" regarding "personal boundaries" that she believed Conneely should adhere to during future visitation periods. Stancek informed Conneely that she would withhold his parenting time unless he agreed to comply with Dr. Hewitt's guidelines. Conneely refused Stancek's demand, and Stancek stopped allowing him to visit A.C.

Stancek also filed a motion in Minnesota district court, alleging that Conneely had sexually abused A.C., and asking the Minnesota court to assume jurisdiction and modify the parenting-time provisions to protect A.C. from Conneely. Stancek also alleged other behaviors by A.C. that she alleged supported her concerns about sexual abuse. The Minnesota district court assumed emergency jurisdiction, appointed a guardian ad litem for A.C., and ordered that A.C. be assessed for potential sexual abuse. The assessor determined that Conneely there was "absolutely no evidence of nudity exposure or sexual abuse by [Conneely]," and opined that A.C.'s other behaviors were "within the normal range of early childhood exploration."

The Minnesota district court returned jurisdiction to Oklahoma under the terms of the Oklahoma dissolution order. Stancek, however, repeatedly refused to travel to Oklahoma to allow visitation as required by the dissolution order. At the end of May 2005, the Oklahoma district court declined further jurisdiction, ruling that Minnesota was a more convenient forum.

From 2005 to 2008, Conneely continued to request that Stancek bring A.C. to Oklahoma for visitation as required by the dissolution order, but Stancek rarely complied. During one visit in 2007, Conneely discovered that A.C. was writing her last name as

4

"Stancek," and he complained to Stancek about it. Stancek did not reply. By mid- to late-2008, Conneely was no longer able to obtain any parenting time with A.C., and he was unable to afford an attorney to enforce his parenting-time rights.

In February 2009, Conneely again requested parenting time, and Stancek did not respond. When Conneely offered to come to Minnesota to get A.C. so that A.C. could be present at his wedding, Stancek waited two months to respond. Conneely finally ceased his efforts to obtain parenting time because he lacked the financial resources to continue and because he felt that the contentiousness of the situation might harm A.C.

In summer 2010, Conneely received a telephone call from Nathan Stancek. Nathan Stancek was in the process of divorcing Stancek, and he wanted to apologize to Conneely for his role in helping Stancek cut Conneely out of A.C.'s life. Nathan Stancek gave Conneely a copy of a custody evaluation from the Stanceks' dissolution proceeding that reported that A.C. was being negatively affected.

The custody evaluation from the Stanceks' dissolution matter revealed that Stancek had engaged in a pattern of behavior towards Nathan Stancek that mirrored her behavior toward Conneely: Stancek had falsely accused Nathan Stancek of sexually inappropriate behavior toward their children, attempted to impose a set of "boundaries," and encouraged the children to report violations of her rules. Because of the effect of her behavior on their children, the district court in the Stancek dissolution matter awarded sole legal and physical custody to Nathan Stancek.

Conneely filed a motion in Minnesota district court in November 2011, seeking sole legal and physical custody of A.C. The district court ordered that he receive

parenting time immediately, but denied his motion for an immediate custody change. That same month, after their first meeting in several years, Conneely and A.C. exchanged numerous text messages and telephone calls. This flurry of communication abruptly ended in December. After Conneely petitioned the district court to intervene, it awarded him parenting time over the Christmas holiday.

In February 2012, the district court ordered the appointment of a guardian ad litem to make recommendations regarding Conneely's custody-change motion. It also ordered the appointment of a custody evaluator, who began work in July after lengthy negotiations "regarding his contract and scope of his investigation, which [Stancek] was seeking to limit." The contract required that Conneely and Stancek each pay 50% of the custody evaluator's fees, but also included an addendum stating that the custody evaluator was not authorized to travel to Oklahoma unless Conneely paid for the expenses associated with such a trip "up front." The addendum allowed, however, that the district court would have the ultimate decision over allocating payment of any fees associated with the custody evaluator's travel to Oklahoma. The contract also authorized the custody evaluator to access custody evaluations from the Stanceks' dissolution matter.

Conneely continued to have difficulty obtaining parenting time in 2012. Stancek would often delay responding to Conneely's parenting time requests or would not respond at all. After Stancek refused to consent to parenting time during spring break and Conneely's and Stancek's attorneys could not negotiate a resolution, the district court ordered that he receive parenting time during spring break. Conneely was forced to

6

obtain assistance from the guardian ad litem to schedule extended parenting time with A.C. during the summer months. When Conneely requested parenting time in September, Stancek did not respond for several weeks. When she did respond, she refused to allow parenting time and explained the delay by claiming that her e-mail account had been down. Evidence later revealed that this claim was false.

During the summer-2012 parenting time, Conneely noticed that A.C. would change how she signed her name depending on whether she was writing to Conneely's family or Stancek's, and that A.C. appeared to believe that she was prohibited from establishing any permanent ties with Conneely or his family.

Trial was originally set for August 2012, but the district court granted continuances to allow time for the custody evaluator to complete his report. Conneely filed a contempt motion, alleging that Stancek was refusing to pay her agreed-upon half of the custody evaluator's fees. The district court issued a show-cause order, but the parties ultimately agreed to defer resolution of the motion until trial. Although it did not rule on the contempt motion, the district court issued an order officially appointing the custody evaluator in December 2012. It found that the custody evaluator's "decision to travel to and work in the State of Oklahoma . . . was reasonable and necessary."

In December 2012, the guardian ad litem issued his report. He recommended that Conneely be awarded sole legal and physical custody, subject to Stancek's "liberal and reasonable" parenting time. The guardian ad litem noted a continuing pattern of Stancek working to block contact between Conneely and A.C. He concluded that "it became apparent that there has been a long established pattern, whereby [A.C.] has not been able

to enjoy a free and open relationship with her father, which is contrary to her best interests." He acknowledged that a "change in custody has the potential for [A.C.] to suffer some emotional harm," but concluded that "the long-term benefit of this change outweighs the potential harm caused by the change."

The custody evaluator submitted his report in January 2013. He analyzed the statutory best-interests factors and, based on an extensive set of interviews and documents, recommended that Conneely "should be awarded sole physical and sole legal custody of [A.C.]" He opined, "I simply do not have any confidence that [Stancek] genuinely understands the damage done [to A.C.] as a result of her actions and, consequently, have little faith that, once the Court is no longer involved, . . . the relationship with [Conneely] will be honored and nurtured from afar."

The district court convened an extended bench trial in February and March 2013, receiving voluminous documentary evidence and extensive testimony. It stated that it spent "weeks" reviewing the record. It found that A.C.'s emotional health and development were endangered because Stancek's actions did not "permit [A.C.] to have a normal parent-child relationship with Mr. Conneelly." It weighed the testimony of competing experts before concluding that "nothing these experts offered show that any harm will come to [A.C. that] outweighs the immense benefit, and relief, a change in custody will provide to this child." It individually evaluated the best-interests criteria listed in Minn. Stat. § 518.17 and the statutory criteria addressing the appropriateness of joint legal and physical custody. It concluded that "an award of sole legal custody and

sole physical custody of [A.C.] to Mr. Conneely is in the best interests of the minor child." It also established a detailed parenting-time schedule.

The district court also addressed Conneely's still-pending contempt motion for Stancek's nonpayment of her portion of the custody evaluator's fees. It noted that Stancek claimed an inability to pay the fees while admitting that her parents pay her legal bills. It also referenced Stancek's ability to pay for two additional expert witnesses and to hire a lawyer for A.C. Based on these observations, the district court found that her nonpayment of the custody-evaluator's fees reflected an "intentional choice" rather than an inability to pay, and it found her in constructive civil contempt.

The district court finally addressed each of the parties' motions for attorney fees. It denied Conneely's motion for conduct-based attorney fees, and, citing Stancek's receipt of assistance from her parents, it denied Stancek's motion for need-based attorney fees.

In a memorandum accompanying its order, the district court acknowledged that its findings were "in large part an adoption of those proposed by [Conneely]." But it reported that it "has made an independent review of the evidence in a painstaking and meticulous manner." And it concluded that Conneely's proposed findings "correctly set[] out what is in the child's best interests."

**D E C I S I O N**

**I.**

Stancek argues that the district court failed to make sufficient findings to justify granting sole legal and physical custody of A.C. to Conneely. "District courts have broad discretion to determine matters of custody." *In re Custody of N.A.K.*, 649 N.W.2d 166, 174 (Minn. 2002). "Appellate review of custody determinations is limited to whether the district court abused its discretion by making findings unsupported by the evidence or by improperly applying the law." *Id.* A district court's factual findings will be upheld unless clearly erroneous. *Pikula v. Pikula*, 374 N.W.2d 705, 710 (Minn. 1985). "A finding is 'clearly erroneous' if the reviewing court is 'left with the definite and firm conviction that a mistake has been made.'" *Vangsness v. Vangsness*, 607 N.W.2d 468, 472 (Minn. App. 2000) (quoting *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999)). When determining whether findings are clearly erroneous, we view the record in the light most favorable to the district court's findings. *N.A.K.*, 649 N.W.2d at 174. And we defer to the district court's assessment of the credibility of witnesses. *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988).

A district court is barred from modifying a prior custody order unless it finds facts, "including unwarranted denial of, or interference with, a duly established parenting time schedule, that have arisen since the prior order . . . , that a change has occurred in the circumstances of the child or the parties and that the modification is necessary to serve the best interests of the child." Minn. Stat. § 518.18(d) (2012). If the district court finds such a change in circumstances, it may modify the custody arrangement when "the

child's present environment endangers the child's physical or emotional health or impairs the child's emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child." Minn. Stat. § 518.18(d)(iv). Stancek challenges the sufficiency of the district court's findings on each element of these statutory requirements.

*Changed Circumstances*

Stancek's counsel agreed at trial that there had been a change in circumstances, stating, "I don't think anybody here is contesting that there's been a change in circumstances since the time that the original order was entered." We therefore conclude that Stancek has conceded the issue. *See Urban v. Continental Convention & Show Mgmt.*, 244 Minn. 44, 47, 68 N.W.2d 633, 635 (1955) ("It is elementary that on appeal a case will be considered in accordance with the theory on which it was pleaded and tried, and a party cannot for the first time on appeal shift his position.").

Even if Stancek had not conceded it, the district court's change-of-circumstances finding was not clearly erroneous. Stancek argues that the district court's finding that A.C. was endangered by Stancek's attempts to cut Connelly out of A.C.'s life are inadequate because they do not including physical abuse or extreme deterioration in Stancek's relationship with A.C., because they address conditions that predate Conneely's earlier attempts to obtain custody, and because they rely on contested testimony from Nathan Stancek. None of these arguments undermines the district court's changed-circumstances finding. Section 518.18(d) explicitly provides that a party's denial of or interference with an established parenting-time schedule constitutes a change

11

in circumstances. The district court found, with ample justification, that Stancek had repeatedly denied Conneely parenting time and had employed a false accusation of sexual abuse to facilitate her efforts. No finding of physical abuse or extreme deterioration in Stancek's relationship with A.C. is required.

Similarly, the district court need not limit its consideration to conditions that arose after Conneely's previous attempts to enforce his parenting-time rights. The statute requires only that a change had occurred since the prior order, which in this case refers to the 2004 dissolution order awarding parenting time. That Conneely had previously tried—and failed—to enforce his parenting-time rights in the face of Stancek's obstruction does not preclude him from trying again.

### *Best-Interests Factors*

Stancek contends that the district court improperly weighed the statutory best-interests factors by failing to (1) explicitly weigh each factor and explain how its weighing led to its conclusion, (2) adequately weigh Stancek's role as A.C.'s primary caregiver, and (3) sufficiently weigh A.C.'s expressed preference. To justify a change in custody, the district court must make findings addressing 13 factors relating to a child's best interests. Minn. Stat. § 518.17, subd. 1(a) (2012). "The [district] court may not use one factor to the exclusion of all others." *Id.*

In its 97-page order, the district court extensively analyzed the best-interests factors from section 518.17, subdivision 1(a). With the exception of one factor, Stancek does not allege that the district court's analysis is inadequate or clearly erroneous, but rather she contends that it "failed to note which factors weighed in favor of each parent

and how it ultimately came to the conclusion that [A.C.'s] best interests would be served by a custody modification." Stancek cites no authority to support her contention that the district court must explicitly state how each factor was weighed. It is also clear from the district court's analysis that it considered at length each factor and its relationship to the facts. Even when it was generally critical about the impact of Stancek's behavior on A.C., the district court did not ignore the aspects of Stancek's parenting that had a positive impact. There is no basis to conclude that the district court's weighing of the best-interests factors was deficient or clearly erroneous.

Stancek focuses specifically on the district court's weighing of two factors—her role as A.C.'s primary caregiver and A.C.'s expressed preference—to support her argument that the district court's overall consideration of the best-interests factors was deficient. The district court recognized that there was no dispute that Stancek had been A.C.'s primary caregiver. But "the fact that one parent may be the primary caretaker does not necessarily control who gets custody. All relevant factors must be weighed in the balance." *Maxfield v. Maxfield*, 452 N.W.2d 219, 222 n.2 (Minn. 1990). And because "there is no articulated, specific standard of law" governing how a district court must weigh the various best-interests factors, there is "scant if any room for an appellate court to question the [district] court's balancing of best-interests considerations." *Vangsness*, 607 N.W.2d at 477.

The district court also must consider a child's stated preference regarding custody if it finds that the child is "of sufficient age to express preference." Minn. Stat. § 518.17, subd. 1(a)(2). But a district court may decline to consider a child's expressed preference

if it finds that it results from "manipulation" by one of the parties. *Geibe v. Geibe*, 571 N.W.2d 774, 778 (Minn. App. 1997). The district court acknowledged that A.C. had "inferred" a preference to stay in Stancek's custody, and it stated that it "considers and respects her voice." It also noted, however, that A.C. had confessed to lying about her preference during her testimony, and it noted variations in her description of her relationship with Conneely. Based on these observations, it concluded that "it is likely that [A.C.'s] voice has been distorted by the significant events in her life and the adults in her life who want her to remain in Minnesota." Given the plethora of evidence in the record documenting Stancek's efforts to cast Conneely in a negative light and cut him out of A.C.'s life, the district court's suspicion that A.C.'s expressed preference to stay with Stancek might be the result of Stancek's and others' manipulation was not clearly erroneous. Accordingly, its decision not to be bound by A.C.'s expressed preference was not an abuse of the district court's discretion.

***Endangerment Finding***

Stancek also challenges the district court's finding that A.C. was endangered in her care. A transfer of custody may be warranted when "the child's present environment endangers the child's physical or emotional health or impairs the child's emotional development." Minn. Stat. § 518.18(d)(iv). "Endangerment requires a showing of a significant degree of danger" to the child. *Geibe*, 571 N.W.2d at 778 (quotation omitted). But "emotional abuse alone may constitute sufficient endangerment" to justify a change of custody. *Id.* at 779. And "[r]epeated, concrete efforts to prevent contact [with a noncustodial parent] could reasonably impact emotional health." *Id.* at 780.

14

The district court found that A.C. was endangered in Stancek's care because "Ms. Stancek will not permit the child to have a normal parent-child relationship with Mr. Conneely." It cited Stancek's lengthy pattern of interfering with Conneely's parenting-time attempts and her attempts to insert A.C. into Stancek's conflicts with Conneely. It found that this pattern endangered A.C.'s emotional health. Its conclusion is supported by both the guardian ad litem and the custody evaluator. The district court's endangerment finding was therefore not clearly erroneous.

Stancek cites *Dabill v. Dabill*, 514 N.W.2d 590 (Minn. App. 1994), to support her contention that establishing endangerment requires a showing that a custodial parent's conduct "must be shown to have an actual, adverse effect on the child" and that "[u]nwarranted denial of or interference with visitation alone is not enough to modify custody." Stancek reads *Dabill* too broadly. In *Dabill*, the custodial parent's interference with parenting time was episodic, and "[t]here was no evidence that visitation problems were continuing when the [district] court modified custody." 514 N.W.2d at 595. Here, the record extensively documents a long-term pattern of Stancek's interference with Conneely's attempts to exercise his parenting-time rights, including a false allegation of sexual abuse. Although the district court noted that Stancek's willingness to allow parenting time had improved after Conneely moved to change custody, it stated that it was "deeply skeptical" because the improvement occurred only "while under tremendous scrutiny." It concluded that the "profound" "weight of the evidence" indicated that Stancek would likely revert to obstructing parenting time once she was no longer under the district court's scrutiny. Given the duration and severity of Stancek's pattern of

15

interference with Conneely's parenting-time efforts, especially when combined with her similar pattern of conduct towards Nathan Stancek, the district court's prediction is well-founded and its conclusion that A.C. was endangered in Stancek's care was not clearly erroneous.

*Harm from Custody Change*

Stancek argues that the district court failed to sufficiently weigh the harm that A.C. would experience as a result of a custody change. To support a change in custody, the district court must find that "the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child." Minn. Stat. § 518.18(d)(iv). She cites *Johnson v. Smith*, 374 N.W.2d 317 (Minn. App. 1985), *review denied* (Minn. Nov. 18, 1985), to support her contention that the district court "arbitrarily discounted" the harm to A.C. that would result from a change in custody. In *Johnson*, we held that the district court abused its discretion when it ordered a child transferred from his eight-year home with a parent based solely on exaggerated allegations of physical abuse and the "ambivalent" expressed preference of the child, and where the district court ignored the child's loss of his opportunities to compete in sports and acted against the recommendation of the guardian ad litem. 374 N.W.2d at 321-22.

*Johnson* is inapposite to the facts here. Rather than ignoring the disruption that the custody change would inflict on A.C., the district court explicitly acknowledged that its decision would "separate [A.C.] from her siblings and move [her] to another state." It noted, however, that disruption in A.C.'s relationship with her siblings was unavoidable even without the change in A.C.'s custody because Stancek had lost custody of A.C.'s

16

siblings. *See also Stancek v. Stancek*, No. A13-0179, 2014 WL 902651, at *14 (Minn. App. Mar. 10, 2014) (affirming award of sole legal and physical custody of the Stanceks' children to Nathan Stancek). It also opined that the harm to A.C. would be mitigated by regular telephone and other electronic contacts with her siblings, and it noted that Nathan Stancek had committed to helping A.C. remain in contact with them. Also, contrary to the facts in *Johnson*, the district court here acted in accord with the recommendations of the guardian ad litem, who recommended the change in custody in spite of the acknowledged difficulties it would pose for A.C.

Stancek contends that the district court erred by failing to allow testimony by four expert witnesses regarding the harm that might result from a custody change. Although Stancek is correct that the district court declined to consider her experts' recommendations, the district court adequately explained its reasons for doing so. It noted that some of those opinions might have been influenced by Stancek's negative characterizations of Conneely. The district court also noted that Stancek's experts lacked credibility because they lacked expertise in the subjects on which they opined, had personal biases, and spent insufficient time with A.C. From this record, the district court did not fail to weigh the opinions of Stancek's experts; rather, it weighed their credibility found it wanting, as is its role. *See Sefkow*, 427 N.W.2d at 210.

In light of the district court's extensive findings in accord with those of the guardian ad litem and the custody evaluator, we conclude that the district court's consideration of the potential for harm to A.C. resulting from the custody change is not impermissibly arbitrary or clearly erroneous.

## II.

Stancek argues that the district court abused its discretion by considering evidence from her parallel child-custody proceeding involving Nathan Stancek. She alleges that the district court's consideration of the evidence violated Minnesota Rule of Evidence 404(b), which bars the admission of other-bad-acts evidence to demonstrate a party's character for committing bad acts. We review a district court's admission of other-bad-acts evidence for abuse of discretion. *State v. Bartylla*, 755 N.W.2d 8, 20 (Minn. 2008). Although generally barred by rule 404(b), other-bad-acts evident may be admissible for other purposes, including establishing "a common plan or scheme." *Id.* "Under the common plan or scheme exception, [other-bad-acts] evidence is admissible if it has a 'marked similarity in modus operandi . . .' that tends to corroborate evidence" in the present matter. *Id.* (quoting *State v. Ness*, 707 N.W.2d 676, 688 (Minn. 2006)). "[T]he preferred approach is for the [district] court to focus on the closeness of the relationship between the other [acts] and the [present case] in terms of time, place, and modus operandi." *State v. Frisinger*, 484 N.W.2d 27, 31 (Minn. 1992).

The district court here focused on evidence from the Stanceks' child-custody matter precisely because of its marked similarity in modus operandi. Having observed that Stancek used a false accusation of sexual abuse to obstruct Conneely's parenting-time efforts and poison his relationship with A.C., the district court observed that she also used the same tactic against Nathan Stancek. It concluded that this pattern was evidence of "continuing trends in Ms. Stancek's lack of capacity to support her children's relationships with their fathers." This determination was relevant to the district court's

18

consideration of whether Stancek's prior behavior toward Conneely was likely to continue into the future. *Cf. Dabill,* 514 N.W.2d at 595 (requiring that the district court consider whether parenting-time problems were continuing at the time of any proposed custody change). Accordingly, the district court did not abuse its discretion by considering the evidence.

Even if the district court's consideration of the evidence had been improper, reversal would not be warranted. The district court stated that it considered evidence derived from the Stanceks' child-custody matter only as a secondary source, and that its findings regarding Stancek's interference with A.C.'s relationship with Conneely "are adequate, in and of themselves, to find that [A.C.] has been emotionally endangered." Accordingly, any error was harmless because the evidence was superfluous. *See State v. Coonrod,* 652 N.W.2d 715, 720 (Minn. App. 2002) ("The erroneous admission of [other-bad-acts] evidence can be harmless error if, based on a review of the entire trial record, there is no reasonable possibility that the wrongfully admitted evidence significantly affected the verdict."), *review denied* (Minn. Jan. 21, 2003).

## III.

Stancek contends that the portion of the district court's order holding her in constructive civil contempt is not supported by adequate findings. We review a district court's decision to invoke its contempt powers for abuse of discretion. *Mower Cnty. Human Servs. ex rel. Swancutt v. Swancutt*, 551 N.W.2d 219, 222 (Minn. 1996). "The factual findings of a contempt order are subject to reversal only if clearly erroneous." *Id.*

Stancek asserts that, because her refusal to pay a portion of the custody evaluator's fees was motivated by her belief that his investigation exceeded the terms of his contract, the district court erred when it held her in constructive civil contempt for failure to pay the fees. But the record indicates that the district court repeatedly advised her of her obligation to pay the fees and that she refused to do so. She cites no authority to support her argument that, in the face of the district court's contrary rulings, her continuing belief that the custody evaluator had exceeded the scope of his contract justified her refusal to pay the fees.

Stancek also implies that her failure to pay the fees was due to a lack of resources. The district court found that Stancek had resources available, based on its observations that her parents were funding her litigation costs and that she was able to expend large amounts in hiring expert witnesses. Although Stancek asserts that this is insufficient to show that she or her parents had "endless resources at their disposal," it is sufficient to demonstrate that the district court's conclusion that Stancek had the ability to pay the fees was not clearly erroneous. We therefore hold that the district court did not abuse its discretion by holding Stancek in constructive civil contempt.

## IV.

Stancek argues that the district court failed to make sufficient findings when it denied her motion for need-based attorney fees. The district court must award need-based attorney fees when it determines

> (1) that the fees are necessary for the good faith assertion of the party's rights in the proceeding and will not contribute unnecessarily to the length and expense of the proceeding; (2) that the party from whom fees, costs, and disbursements are sought has the means to pay them; and (3) that the party to whom fees, costs, and disbursements are awarded does not have the means to pay them.

Minn. Stat. § 518.14, subd. 1 (2012). The decision whether to award need-based attorney fees "rests almost entirely within the discretion of the [district] court and will not be disturbed absent a clear abuse of discretion." *Jensen v. Jensen*, 409 N.W.2d 60, 63 (Minn. App. 1984). "Conclusory findings on the statutory factors do not adequately support" a district court's attorney-fees decision. *Geske v. Marcolina*, 624 N.W.2d 813, 817 (Minn. App. 2001), *review denied* (Minn. Aug. 20, 2002). But "a lack of specific findings . . . is not fatal . . . where review of the order reasonably implies that the district court considered the relevant factors and where the district court was familiar with the history of the case and had access to the parties' financial records." *Id.* (quotations omitted).

Here, the district court relied on its considerable familiarity with the history of the case when it refused Stancek's motion for need-based attorney fees. It referenced testimony from Stancek's father, a pastor, indicating that he, not Stancek, was paying Stancek's legal fees. It found that her father's claim that he was not using financial gifts

21

from his congregation to pay Stancek's fees was not credible. It noted that Stancek herself offered conflicting testimony about her ability to pay various fees associated with the litigation, finding that "when Ms. Stancek wants to pay she can muster up the financial resources." Based on its review of the testimony it received and the history of the case, it concluded that "Ms. Stancek is not paying her bill in this case because she sees Mr. Conneely as a deep pocket to pay her fees." It also found that "[t]here is no evidence before the Court that Mr. Conneely has the income or financial resources to make any contribution" toward Stancek's attorney fees. These statements indicate that the district court considered the relevant statutory factors and, relying on its familiarity with the case, concluded that Stancek was not entitled to need-based attorney fees. Its conclusion was not an abuse of its discretion.

**Affirmed.**