*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1920**

In re the Marriage of:
Nathan Francis Gregor, petitioner,
Respondent,

vs.

Dawn Marie Buttera Gregor,
Appellant.

**Filed February 8, 2016
Affirmed; motion granted
Stauber, Judge**

Olmsted County District Court
File No. 55-FA-08-2925

Amber M. Lawrence, Dittrich & Lawrence, P.A., Rochester, Minnesota (for respondent)

Dawn B. Gregor, St. Paul, Minnesota (pro se appellant)

Considered and decided by Halbrooks, Presiding Judge; Stauber, Judge; and Reyes, Judge.

## U N P U B L I S H E D   O P I N I O N

**STAUBER**, Judge

In this custody dispute, pro se appellant argues that (1) the district court erred in evaluating two of the statutory best-interests factors; (2) the district court erred in granting father sole legal and physical custody of the parties' child; (3) appellant should be granted unsupervised parenting time; (4) the district court acted improperly by

meeting with the child in chambers without meeting the statutory safeguards of Minn. Stat. § 518.166 (2012); and (5) the district court erred in its evidentiary rulings and was biased against appellant. We affirm the district court's decision, and we grant respondent's motion for attorney fees.

## FACTS

The parties have one minor child together, B.G., born December 27, 2002. The parties were divorced by stipulated judgment and decree on April 24, 2008. Under the judgment and decree, the parties shared joint legal and physical custody of B.G. and were awarded equal parenting time. On February 17, 2012, a stipulated order was entered modifying the parenting-time schedule. Under the modified schedule, respondent-father Nathan Francis Gregor had parenting time every Monday and Tuesday overnight and every other weekend, and appellant-mother Dawn Buttera Gregor had parenting time every Wednesday and Thursday overnight and every other weekend.

In the spring of 2012, mother notified father that she intended to move with B.G. and her younger daughter from the Rochester area to Minneapolis for employment reasons. Father repeatedly objected to B.G. moving to Minneapolis and attending school there. Mother pressured B.G. to become involved in the decision-making process, causing B.G. to experience significant stress. Mother moved to Minneapolis, and B.G. remained with father and attended school in Rochester. The parties participated in mediation to work out a new parenting-time schedule. The mediated schedule granted mother parenting time two weekends each month with weekends to correspond with any days off from school.

Mother bought B.G. a cell phone, so they could have contact at all times. Mother became angry with B.G. if he missed a call from her and did not immediately return it. Two calls left B.G. in tears as a result of statements made by mother. Father eventually took the cell phone away from B.G. because of the stress caused to B.G. by mother's calls.

Mother behaved inappropriately at parenting-time exchanges, causing B.G. to experience significant stress. For example, in October 2012, mother became angry with father and "yelled that he was a 'terrible father and a weak and pathetic man'" and attempted to hit him. B.G. witnessed the altercation from inside mother's apartment. Father left without B.G. Mother also interfered with father's parenting time on other occasions, picking up B.G. early from school on one occasion and going to father's residence and attempting to forcibly enter the house on another occasion.

On November 13, 2012, the district court issued an emergency interim order granting mother parenting time over the weekends of November 22 and December 7, 2012, and scheduling a hearing for December 11, 2012. On November 15, 2012, mother sent the police to father's home to conduct a child-welfare check. The district court found that mother's "contact with the police does not appear to have been based on a good faith belief that [B.G.] was endangered and the police visit to [father's] residence amounted to an effort to harass [father's] family."

At the December 11, 2012 hearing, the district court found that father had made a prima facie case for custody modification. The court explained:

> [B.G.] continued to be under significant pressure from the Mother to decide where he wanted to live and attend school. The Mother continued to place [B.G.] in the middle of the adult issues, even showing him e-mails between the Mother and the Father's attorney. The Father observed [B.G.] was no longer himself; he was suffering from anxiety, he was always stressed about his potential move to the cities, seeing his Mother, and the information his Mother was sharing with him. [B.G.'s] teachers and principal also observed [B.G.] was struggling in school and was not himself. [B.G.] complained of headaches, stomach aches, and loss of appetite. [B.G.] was not sleeping well and was grinding his teeth. [B.G.] was becoming withdrawn and distressed. [B.G.] described the pressure from his Mother as feeling like "bricks on his back that kept regenerating."

The district court ordered that B.G. reside with father subject to parenting time for mother of up to three weekends a month with each weekend specified. The court also ordered that the parties not involve B.G. in their disputes or decision-making and that B.G. return to counseling. Father scheduled four appointments for B.G. to meet with the counselor in January 2013, but mother canceled them.

In January 2013, mother enrolled B.G. in Whittier Elementary School in Minneapolis on January 15. When the school secretary asked about the status of the custody dispute, mother reported that father had abandoned B.G. On January 23, 2013, the district court issued an emergency-interim order requiring that B.G. be immediately returned to father's care and custody, suspending mother's parenting time, and requiring that any contact between mother and B.G. be supervised at the Family Access Center (FAC) until a court hearing scheduled for February 11, 2013.

At the February 11, 2013 hearing, the parties agreed that father would be awarded temporary sole legal and physical custody subject to parenting time for mother every

4

other weekend with one weekend unsupervised at mother's residence and the other weekend supervised by mother's parents at their home. Parenting-time exchanges were to occur at designated police stations. The court appointed a guardian ad litem (GAL) to make recommendations on permanent legal and physical custody and long-range parenting time.

Mother continued to behave inappropriately at parenting-time exchanges, making it difficult for B.G. to return to Rochester with father. The parenting-time exchange following the first weekend that mother exercised parenting time at her parent's residence took over two hours and involved mother, her parents, father, B.G., and the police. B.G. stated to the counselor that parenting-time exchanges are very difficult because mother is upset about saying goodbye, he feels badly for his mother and sister when he leaves, and he remains upset for a day or two after an exchange.

At the GAL's recommendation, father filed a third motion for emergency relief, requesting that mother's parenting time be supervised at the FAC. On March 23, 2013, the district court issued an emergency-interim order that mother have no contact with B.G. except limited, supervised parenting time at the FAC. That evening, mother asked police to conduct a child-welfare check at father's home. An officer spoke with B.G. at length and reported to the GAL that B.G. said that "the only thing that causes him to be afraid and upset is when he thinks his mom will be angry."

In a report filed on April 5, 2013, the GAL expressed concern about mother putting tremendous pressure on B.G. by encouraging B.G. to express his "true" feelings and talk about what he wants. The report also notes that mother causes challenges for

B.G. by encouraging him to purposely disrespect rules in father's home. The report states that B.G. does not want to upset mother and that mother does not recognize how her actions affect B.G. The GAL opined that until mother can recognize the effect her actions have on B.G. and be supportive of his relationship with father, mother's behavior will continue to affect B.G.'s emotional well-being.

Following a hearing on April 12, 2013, the district court ordered that mother have no contact with B.G. other than supervised parenting time at the FAC and phone calls monitored by the GAL. The court ordered mother to exercise consistent and frequent supervised parenting time during a 30-day period to allow the GAL to observe and assess the interactions between mother and the GAL. The court ordered the GAL to then file a report indicating whether parenting time outside the FAC was in B.G.'s best interests.

The district court ordered both parties to undergo psychological testing with Donald Williams at Decision Point Behavioral Health and follow all recommendations by Williams. The court directed Williams to get input from the opposing party and the GAL before conducting the testing. The court ordered both parties to schedule their evaluations by May 6, 2013. Father completed a psychological evaluation on May 16, 2013. Mother did not contact Williams and refused to undergo an evaluation by him but was evaluated by two psychologists of her own choosing.

The district court ordered both parties and B.G. to work with Judy Dawley at ABC Child and Family Therapy to address parenting B.G. in a supportive manner to serve his best interests. B.G. began meeting with Dawley in May 2013. Mother met with Dawley once during the summer of 2013 but refused to return unless father dropped the court

case. Father has had ongoing contact with Dawley and sought her advice since B.G. began seeing her.

After the April 12, 2013 hearing, mother repeatedly tried to have unsupervised phone calls with B.G. and once had unsupervised contact with him at school, although the district court found that contact limited and inconsequential. Mother made disparaging statements about the court system, the GAL, father's attorney, mother's previous attorneys, father, and stepmother in letters, e-mails, and Facebook postings.

Mother did not exercise parenting time with B.G. until June 16, 2013. She exercised parenting time once more in June and twice in July 2013. The visits were completed successfully without incident. After the GAL issued her recommendations on July 26, 2013, mother did not exercise parenting time until August 17, 2013. Mother exercised parenting time two more times in August and three times in September 2013. The visits went well.

In the July 26, 2013 report, the GAL expressed "great concern" about mother's failure to follow court orders, put B.G.'s needs first, work with Dawley, and undergo court-ordered psychological testing. The GAL stated: "[Mother] does not appear to recognize how her actions have caused [B.G.] harm. Therefore, I do not know if she has or will make any changes." The GAL recommended that father be granted sole legal and physical custody and that mother continue having supervised parenting time at the FAC with a slow transition to unsupervised parenting time if the supervised parenting time continued going well.

When mother exercised parenting time at the FAC on November 9, 2013, she told B.G. that the FAC would not allow her to visit B.G. again because she was going to say "what she wanted to say." Mother's statements included telling B.G. that his father was "evil" and was taking B.G. away from mother. The monitor instructed mother numerous times to stop the conversation, but she refused and referred to the FAC as "stupid." The monitor called the team lead to assist. When the team lead stepped between mother and B.G., mother yelled at and pushed the team lead. The incident was extremely frightening and upsetting to B.G., and he experienced increased anxiety for some time afterward. Mother had no contact with B.G. after the November 9 incident.

In an order filed June 2, 2014, the district court found that a substantial change in circumstances had occurred, that the B.G.'s present environment with mother endangered his emotional health and could impair his emotional development as long as mother persisted in involving B.G. in the custody dispute, that a change of custody was necessary to serve B.G's best interests, and that the benefit of the change outweighed any harm associated with the change. The court awarded father sole legal and physical custody. The court granted mother unsupervised parenting time on an increasing schedule, beginning with three nights each week. The court explained that it was granting unsupervised parenting time because opportunities for supervised parenting time were limited, mother was prohibited from returning to the FAC because she had served it with a summons and complaint, and mother had suffered the consequence of no contact with B.G. since November 2013. The district court denied mother's new-trial motion. This appeal followed.

8

# DECISION

## I.

This court will not overturn a district court's custody-modification decision unless it reflects an abuse of discretion either based on findings unsupported by the evidence or on the improper application of law. *Goldman v. Greenwood*, 748 N.W.2d 279, 284 (Minn. 2008). We review the record in a light favorable to the findings. *Sharp v. Bilbro*, 614 N.W.2d 260, 263 (Minn. App. 2000), *review denied* (Minn. Sept. 26, 2000). And we will not set the findings aside unless they are clearly erroneous. *Goldman*, 748 N.W.2d at 284.

### A. Child's reasonable preference

Mother argues that the district court did not assign sufficient weight to B.G.'s preference. Under the statute in effect when the district court issued its decision, the court was required to evaluate "the reasonable preference of the child, if the court deems the child to be of sufficient age to express preference." Minn. Stat. § 518.17, subd. 1(a)(2) (2012).

The district court found:

> [B.G.] is not mature enough to state a preference for custody. By reports of independent parties who have seen him, he is intelligent and creative and an active 11 year old engaged in age-appropriate activities. He has, however, been placed in the midst of a dispute between his parents and his comments and reactions demonstrate that it is not healthy for him to feel he has responsibility for this decision. When pressured to state a preference or take a side he has reacted with headaches, crying, hitting himself, loss of appetite, and attempts to say things that will please his parents. He has attended counseling to help him work through the issues. It is impossible, at this

9

point, to have faith that any expression of preference on his part will be more than an attempt to please the parent he thinks is applying the most pressure.

Considerable record evidence shows that mother repeatedly tried to pressure B.G. into stating a preference on custody; that her conduct during parenting-time exchanges made it difficult for B.G. to leave with his father; that she stated to B.G. that father was trying to take him away from her; and that mother's conduct had a significant detrimental effect on B.G. The district court did not err in finding that B.G. was unable to state a reasonable preference on custody.

In her reply brief, mother challenges the district court credibility determinations of evidence regarding B.G.'s ability to express a reasonable preference on custody. This court defers to the district court's credibility determinations. *Vangsness v. Vangsness*, 607 N.W.2d 468, 472 (Minn. App. 2000).

**B.    Parents' encouragement of other parent**

The statute in effect when the district court issued its decision required the court to consider "the disposition of each parent to encourage and permit frequent and continuing contact by the other parent with the child." Minn. Stat. § 518.17, subd. 1(a)(13) (2012). Minn. Stat. § 518.17, subd. 1(a)(11) (Supp. 2015).

The district court found:

> The Father wants [B.G.] to have a healthy relationship with his Mother. The Father has followed all orders of this Court. The Father has worked cooperatively and respectfully with the [GAL] and [B.G.'s] counselors.

10

The Father willingly cancelled and rearranged family plans in order to accommodate the Mother's sporadic requests for parenting time at the [FAC].

When the Mother's contact was suspended as a result of her actions at the [FAC] on November 9, 2013, the Father sought assistance from [B.G.'s] counselor, Judy Dawley, to allow for the exchange of Christmas presents between [B.G.] and his Mother.

When the GAL was no longer able to supervise telephone contact between [B.G.] and his Mother, the Father offered to continue the calls with him being the supervisor. The Mother refused.

The Mother does not have the disposition to encourage the relationship between [B.G.] and his Father unless it is on her terms. The Mother actively encouraged [B.G.] not to leave with his Father at a parenting time exchange resulting in [B.G.] being left with his Mother in Minneapolis. The Mother has made parenting time exchanges difficult on [B.G.] by openly crying in front of him when he is trying to leave, resulting in exchanges taking over two hours and involving the police. Even when advised by the GAL to say her goodbyes and get [B.G.] ready to go with the Father, the Mother failed to do so. The Mother is convinced [B.G.] hates his Father and allegedly told [B.G.] his Father is evil. The Mother maintains that she only told [B.G.] that the Father has done evil things. [B.G.'s] therapist discussed with the Mother that [B.G.] in fact loves his Father, but the Mother was unwilling to accept that as true.

The record evidence supports these findings, and the findings support the district court's determination that this factor weighs in favor of father.[1]

---

[1] We need not address mother's argument that a 2015 amendment to the best-interests factors should apply in this case because, even if the amended version applies, mother's challenge to the district court's findings on the best-interests factors fails. *See* Minn. Stat. § 518.17, subd. 1(a)(3), (11) (Supp. 2015) (requiring court to consider "the reasonable preference of the child if the court deems the child to be of sufficient ability, age, and maturity to express an independent, reliable preference" and "the disposition of each

**II.**

Mother challenges the district court's award of sole legal and physical custody to father.

> [T]he court shall not modify a prior custody order . . . unless it finds, upon the basis of facts, . . . that have arisen since the prior order or that were unknown to the court at the time of the prior order, that a change has occurred in the circumstances of the child or the parties and that the modification is necessary to serve the best interests of the child. In applying these standards the court shall retain the custody arrangement . . . that was established by the prior order unless: . . .
> (iv) the child's present environment endangers the child's physical or emotional health or impairs the child's emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child . . . .

Minn. Stat. § 518.18(d) (2012).

**A.      Change in circumstances**

The change in circumstances must be real and not a continuation of ongoing problems. *Roehrdanz v. Roehrdanz*, 438 N.W.2d 687, 690 (Minn. App. 1989), *review denied* (Minn. Apr. 25, 1989). When father objected to mother relocating to Minneapolis with B.G., mother became uncooperative in resolving parenting-time disputes and began engaging in conduct detrimental to B.G. She refused to recognize the effect of her conduct on B.G. or change her behavior. The evidence supports the district court's finding of a change in circumstances.

---

parent to support the child's relationship with the other parent and to encourage and permit frequent and continuing contact between the child and the other parent.").

12

**B.** **Endangerment**

Endangerment implies likely harm to the child's emotional state. *Sharp*, 614 N.W.2d at 263. A parent's efforts to undermine a child's relationship with the other parent may endanger the child. *Smith v. Smith*, 508 N.W.2d 222, 227 (Minn. App. 1993).

Mother's argument suggests that the district court's finding of endangerment was based on her relocation to Minneapolis. But the district court found:

> The child's present environment with the Mother endangers his emotional health and could impair his emotional development as long as the Mother persists in involving [B.G.] in the custody dispute. Continuing under a joint legal or joint physical custody arrangement will result in further endangerment to the child's emotional health and impairment to his emotional development.

Mother argues that any endangerment occurred because "the [district] court allowed father and his attorney to bully mother through litigation to deny mother almost all parenting time with her child" and that "[a]s of the date of submission of this brief, this misbehavior by father is continuing." This argument challenges the district court's credibility determinations. This court defers to the district court's assessment of witness credibility. *Vangsness*, 607 N.W.2d at 472.

**C.** **Balance of harms**

The party seeking modification must show that the advantage of modifying custody outweighs the harm likely to be caused by the custody change. *In re Weber*, 653 N.W.2d 804, 811 (Minn. App. 2002). This factor may be implicit in other factors. *Giebe v. Giebe*, 571 N.W.2d 774, 778 (Minn. App. 1997).

In addressing B.G.'s best interests, the district court found:

> [B.G.'s] emotional health and development was endangered while having unsupervised contact with his Mother. As a result of the pressure [B.G.] was feeling from his Mother to advocate her interests of having him reside with her and attend school in Minneapolis, [B.G.] expressed suicidal thoughts and was engaging in self-harm. The pressure from the Mother was emotionally exhaustive for [B.G.] and caus[ed] [B.G.] high anxiety. [B.G.'s] physical health was suffering as [B.G.] was complaining of headaches, stomach aches, lack of appetite, grinding his teeth, and inability to sleep. [B.G.] was also struggling at school. Since having limited and supervised contact with his Mother, [B.G.'s] mental and physical health has improved and [B.G.] is no longer exhibiting the concerning behaviors previously observed by the Father, [stepmother], the GAL, and his therapist, Judy Dawley.

The district court did not err in determining that the advantage of modifying custody outweighed any potential harm.

The evidence supports the district court's findings on the factors relevant to custody modification, and those findings support the award of sole legal and physical custody to father.

## III.

Mother does not object to the parenting time awarded her in the June 2014 order. Rather, she argues that, in April 2015, father discontinued mother's parenting time and phone contact with B.G. and that he did so unilaterally without consulting the district court and without any valid reason. After this appeal was filed, mother moved the district court to address father's denial of her parenting time. On October 26, 2015, the district court issued an order taking that motion under advisement. Because mother does not object to the parenting time awarded to her in the order from which this appeal was taken,

14

the issue is not properly before this court. *See Thiele v. Stich*, 425 N.W.2d 580, 582

(Minn. 1998) (stating that appellate courts address only issues that were presented to and

considered by the district court).

**IV.**

Mother argues that the district court erred by meeting with B.G. without

complying with the requirements of Minn. Stat. § 518.166, which states:

> The court may interview the child in chambers to ascertain the child's reasonable preference as to custodian, if the court deems the child to be of sufficient age to express preference. The court shall permit counsel to be present at the interview and shall permit counsel to propound reasonable questions to the child either directly or through the court. The court shall cause a record of the interview to be made and to be made part of the record in the case unless waived by the parties.

Mother frames the issue as whether the district court "should be reprimanded for

providing psychological services to [B.G.]" In the order denying mother's new-trial

motion, the district court explained:

> The Court met with [B.G.] in chambers in April 2013. This interview was done on the recommendation of the GAL and with the agreement of both parties. The court met with [B.G.] both to get to know [B.G.] a little better and to specifically assure him that his preference would play no role in the court's decision on custody Essentially, the purpose was to take pressure off [B.G.] by assuring him that adult decisions would be left to the adults. This was in response to the evidence before the court that [B.G.] was at this time engaging in self-harm and suicidal thoughts due to his belief that it was his responsibility to choose between his parents. The GAL was present in chambers during this meeting. The only information the Court considered from this interview was that [B.G.] loves both his parents and wants to be with both of them.
>
> . . . .

15

> Mother has not cited any law in support of her position that the Court must provide a transcript of a meeting that is not intended to determine the child's custodial preference. This court's research has been unable to uncover any such legal authority. Needless to say, not every meeting in chambers is for the purpose of determining the child's custodial preference.

Mother argues that the meeting was improper under *State v. Deal*, 740 N.W.2d 756, 759 n.1 (Minn. 2007) (stating that chapter 518 provides extensive procedures for determining a child's best interests and that "[t]he only direct questioning of a child whose custody is at issue appears to be a discretionary in-camera interview by the court to determine the child's custodial preference"). Mother's framing of the issue and argument completely mischaracterize what actually occurred. The purpose of the meeting was not to obtain information relevant to the court's determination of B.G.'s custody, best interests, or any other issue in the case, or to provide psychological services. The sole purpose was to assure B.G. that he would not be involved in the decision-making process, and the meeting occurred at the GAL's recommendation and with the approval of both parties. Contrary to mother's assertion of district court error, the district court should be applauded for handling a delicate matter with sensitivity and a proper exercise of its discretion.

## V.

Mother further argues that the district court erred in excluding from evidence the parties' psychological evaluations. Father's psychological evaluation was admitted into evidence. Attached to an affidavit by mother was an excerpt from the Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR, describing negative personality traits associated with a specific personality disorder, and mother argues that father's evaluation shows that he has those negative personality traits. But father's evaluation did not identify him as suffering from that disorder; the evaluation states that all of father's test results were valid and describes him as "appearing to be well adjusted."

Mother submitted a psychological evaluation conducted by two psychologists of her own choosing. The district court stated that it had scanned both parties' evaluations and found them relevant only in that they showed there was no pathology or mental-health issues that impacted the parties' parenting capabilities. The district court's detailed findings in its 81-page order show that its decision was based the conduct engaged in by mother that was detrimental to B.G., including her repeated failures to comply with court orders. Mother's evaluation does not indicate that the psychologists were provided with any of that information, and, therefore, does not contradict the court's findings. Mother's argument regarding the district court's assessment of the parties' psychological evaluations is without merit.

Mother argues that Dawley and the GAL were "incompetent in this proceeding" because they "had no training in detecting or responding to batterers or domestic

17

violence." The record contains no evidence that father was a batterer or domestically violent. Mother does not otherwise challenge their qualifications.

No evidence in the record supports mother's assertion that the district court was biased against her. Rather, the record shows that mother acted extremely unreasonably throughout this proceeding and that she failed to implement the numerous opportunities offered to her to change her behavior.

## VI.

Father has moved for conduct-based fees on appeal in the amount of $3,336. Fees may be awarded under Minn. Stat. § 518.14, subd. 1 (2014), if a party has "unreasonably contribute[d] to the length or expense of the proceeding." Mother has made simultaneous motions in the district court and in this court, raising the same issues, and she sought an extension to delay the appeal until the district court ruled on the motions. In this appeal, mother has mischaracterized what occurred before the district court, made arguments unsupported by any evidence, and raised an issue not properly before this court. Because mother's conduct has significantly contributed to the expense of these proceedings and the affidavit submitted by father's attorney supports the fee request, we grant father's motion for $3,336 in attorney fees.

**Affirmed; motion granted.**