# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 20, 2019 Session

## STATE OF TENNESSEE v. DONALD LEE HARRIS

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-3164    Cheryl Blackburn, Judge**

_____

### No. M2018-01680-CCA-R3-CD

_____

Aggrieved of his Davidson County Criminal Court jury convictions of one count of felony murder in the perpetration of aggravated child neglect, one count of the facilitation of felony murder in the perpetration of aggravated child abuse, three counts of aggravated child abuse, one count of aggravated child neglect, and one count of the facilitation of aggravated child abuse, the defendant, Donald Lee Harris, appeals. The defendant alleges that the trial court erred by permitting the State to introduce the victim's medical records on rebuttal, that the State's election of offenses was insufficient to ensure jury unanimity, that the trial court erred in its jury instructions regarding criminal responsibility for the conduct of another, that the evidence was insufficient to support his convictions, and that the total effective sentence of life plus 75 years is excessive. The defendant's convictions of felony murder (Count 9), facilitation of felony murder (Count 8), aggravated child abuse (Counts 2 and 3), aggravated child neglect (Count 7), and facilitation of aggravated child abuse (Count 1) are affirmed. We find no error in the sentencing decisions of the trial court. Because the State's election of offenses was insufficient to safeguard the defendant's right to a unanimous verdict in Count 6, the defendant's conviction in Count 6 is reversed. Because dual convictions of aggravated child abuse in Counts 2 and 3 violate double jeopardy principles, those convictions must be merged. The case is remanded for a new trial on the offense of aggravated child abuse in Count 6 and for the entry of corrected judgment forms reflecting the merger of Counts 2 and 3.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Manuel B. Russ (on appeal) and Leah Wilson (at trial), Nashville, Tennessee, for the appellant, Donald Lee Harris.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Pam Anderson and Doug Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Davidson County Grand Jury charged the defendant and Shantonio Hunter with six counts of aggravated child abuse, one count of aggravated child neglect, one count of felony murder in the perpetration of aggravated child abuse, and one count of felony murder in the perpetration of aggravated child neglect for injuries inflicted on Ms. Hunter's three-year-old son, E.H., that eventually led to his death.

*Trial*

On April 26, 2013, Metropolitan Nashville Police Department ("Metro") Officer Brandon O'Guinn responded to a call of an unresponsive child at 919 North 12th Street in Nashville. When Officer O'Guinn approached the apartment, he encountered Ms. Hunter in the doorway, screaming. She "alluded to the right side of the door," and he entered the apartment to the right. Inside the apartment, Officer O'Guinn observed "a small boy on an air mattress . . . being given CPR by the defendant." When he checked for the victim's pulse and found none, Officer O'Guinn told the defendant to continue CPR. He recalled that the emergency medical personnel arrived within two minutes, and the victim was taken to Vanderbilt University Medical Center ("VUMC") via ambulance. After the victim was taken from the scene, Officer O'Guinn asked the defendant, who was visibly upset, what had happened. Officer O'Guinn testified,

> He had indicated that the child had been sick overnight several times and [the victim] had -- defecated and thrown up on himself. He had been given a bath several times. I do recall the mattress being wet underneath where the small child was laying and I initially, I mean just thinking, thought that he might have drowned in the tub. I remember asking did -- at any time did he go under the water, and he said no. But that was the reason . . . for the dampness under the body and why he was wet at the time, that he had just got out of the tub because he had been sick and had some issues overnight.

Metro Officer Joseph Progar, who also responded to the scene, went into the bathroom and saw "that the bathtub was drained but it was still wet, and there was

-2-

like a towel or washcloth that was in the tub." The floor was wet, and another towel lay on the toilet seat. The defendant, who was "very upset," told Officer Progar "[t]hat the child had soiled himself and that the child had, you know, like two baths within about an hour and a half or so." Officer Progar also observed a bottle of children's cold medication on the floor next to the air mattress.

Metro Crime Scene Investigator Joe Williams responded to VUMC, where he spoke with Detective Selene Julia before photographing the victim's body. While photographing the body, Investigator Williams observed a bruise "above the rib stomach area" that "had . . . real faded dots from like where a knuckle" had struck him with a fist.

Sharon Tilley, who was a Metro Crime Scene Investigator at the time of the victim's death, photographed the apartment and collected various items of evidence, including a green fabric belt with a ring loop closure, a "white metal stud belt" that was broken and stained with something reddish brown, a piece of black belt, and an orange polo shirt stained with a reddish-brown substance.

Metro Detective Selene Julia responded to VUMC, and, when she arrived sometime between 7:30 and 8:00 a.m., the victim had not yet been pronounced dead. By the time she saw him, however, he had been pronounced dead. Detective Julia observed "numerous physical injuries on him," including "noticeable injures" on the victim's chest, stomach, sides, and face.

Detective Julia identified the defendant's voice on telephone recordings that were exhibited to her testimony and played for the jury. In the first recording played for the jury, the defendant said of the victim, whom he called "Man Man," "He got a[n] ass-whooping from me Monday. . . . He got hit Wednesday night." The defendant also said, "Man Man got put out of school that Monday when I whooped him. That's when he got put out of school. It's the same week that he died." In the second recording, the defendant stated that he and the co-defendant, the victim's mother, had "lived together for a whole year basically." In the third recording, the defendant said that he "was not the last one who hit Man Man," explaining, "And . . . it all happened Wednesday. When I got home from work. That's when it happened. Because me and her got to arguing about something. She took it out on him." The defendant said that he had not initially told the police about Ms. Hunter's involvement, saying, "That's why I didn't say nothing because I love her. . . . I was gonna do life for the girl."

Assistant Davidson County Medical Examiner Doctor David Zimmerman, who performed the autopsy of the victim, testified that the victim's body was essentially covered with fresh, healing, and old wounds. The victim had multiple abrasions "on the forehead, on both cheeks, on the chin and on the bridge of the nose." The skin on the

-3-

bridge of the victim's nose, his frenulum, and the skin "on the left side on the inside of the [lower] lip" all bore lacerations. Doctor Zimmerman noted that the wounds on the bridge of the victim's nose were starting to heal, indicating that they had been inflicted "[h]ours to a couple of days" before the autopsy. Similarly, abrasions on the victim's lower lip, chin, and left cheek were "hours to days" old. The injuries to the inside of the victim's mouth had "been there a couple of hours" before the victim's death.

The skin underneath both of the victim's eyes was bruised, and Doctor Zimmerman observed bruises on the victim's cheek and temple. The victim had abrasions on his face and behind his ear as well as bruising, abrasions, and a scar underneath his chin and an abrasion on the left side of the neck. Upon pulling back the skin of the victim's head, Doctor Zimmerman found blood between the galea, the layer of connective tissue "attached right to the skull," and the bones of the skull "kind of on the forehead going up onto the scalp" that coincided with "abrasions of the skin" in that same area. More impact than a simple trip and fall would have been necessary to cause the subgaleal hemorrhage.

Doctor Zimmerman observed scarring patterns on the victim's body that looked like small dashes as well as scarring above the victim's right eye and on his cheek. Doctor Zimmerman observed a contusion on the victim's chest. Scars on the upper left quadrant of the victim's torso "were at least months or weeks old. . . . They were completely healed." An abrasion on the tip of the victim's penis formed the same small dot pattern as those on other parts of the victim's body. Doctor Zimmerman observed an abrasion on the victim's inner right thigh that formed that same pattern as well as abrasions, scars, and contusions on the right buttock, right torso, and right arm. Similar circular contusions also appeared near the victim's spine.

Doctor Zimmerman observed "abrasions, contusions, and . . . scars" on the victim's back and buttocks, some of which formed a linear pattern. Doctor Zimmerman explained,

> If a long thin object were used and it struck the skin, it'll press the blood out of the skin right where it hits and it'll cause the capillaries to rupture at the edges and that'll cause the bruising around where the object was hit. And there won't necessarily be any bruising directly where the object hit.

Linear abrasions on the right side of the victim's chest that were "hours to days" old lay at right angles, indicating that those abrasions were "either two impacts with something that would abrade the skin or . . . a single impact of something that has a right angle on

it." The scars on the victim's back and buttocks, both the round and the linear, were "all well-healed scars so weeks to months old." In addition to these scars, Doctor Zimmerman found "multiple well-healed scars, weeks to months old," on the back of the victim's legs that appeared to wrap around the backs and sides of the leg; "there were significantly more on the right leg than on the left." He also found "some scabbed abrasions" on the victim's legs that took the form of "dark dots." Those were "hours to days old." There were abrasions on the left inner thigh, both partially healed and acute, as well as scarring. The circular pattern contusions also appeared on the back of the victim's left leg. Doctor Zimmerman said that the linear contusions on the back of the victim's leg were consistent with a long strap-like item striking the skin. Contusions and scarring also appeared on the back of the victim's right hand.

Doctor Zimmerman found contusions and "small little dots of abrasions" on the abdomen and a variety of abrasions on the abdomen near the belly button. He observed that the victim's abdomen was "protuberant which means it's kind of sticking out." Additionally, "some dark discoloration of the abdomen," indicating a bruise, aligned to injuries that Doctor Zimmerman found to the victim's intestines. Upon internal examination of the victim's abdomen, Doctor Zimmerman found "about 45 milliliters of serosanguinous fluid and fibrinopurulent debris." The amount of serosanguinous fluid, "the same fluid that you would see in a blister on your skin," inside the victim's abdomen was equivalent to "about one and a third cans of soda." Fibrinopurulent debris, he explained, is a "stringy, green, thick material that was on the organs, the surfaces of the organs in the abdomen. And that's part of the body's healing process. It has white blood cells and other proteins to wall off any kind of infection that would be in the abdomen." The presence of the serosanguinous fluid and fibrinopurulent debris indicated that "there was an acute peritonitis in the abdomen. That means there's an infection in the abdomen." When he examined the victim's intestines, Doctor Zimmerman found that some of "the loops of the intestines were also stuck together." He also observed "bruises on the surfaces of both the small bowel and the colon" as well as more than one "area of necrosis which means that part was dead tissue. . . . the color wasn't right. It was more of a grayish color, and there was also hemorrhage or bleeding on the serosal surfaces as well." Doctor Zimmerman testified that the process of necrosis would have taken "hours or days."

Doctor Zimmerman found another 100 milliliters of serosanguinous fluid in the victim's chest as well as "plural adhesions, . . . where the outside surface of the lung is stuck to the chest wall," that could be attributed to either "some kind of infection or some sort of injury in the chest."

Doctor Zimmerman testified that peritonitis is typically accompanied by symptoms such as pain in the abdomen, fever, irritability, loss of appetite, vomiting,

diarrhea, and decreased movement. He said that peritonitis could be caused by "either an injury or an infection that has spread to the abdomen" and that, to cause peritonitis, an injury would have "to be a hard enough injury where it can cause a hole in the intestines or stomach. And then some of those contents spill into the abdominal cavity and then the body tries to fight off that infection that's occurring because of that." He found evidence that the contents of the victim's intestines had spilled into the abdominal cavity when viewing the slides he created using material from the outside of the victim's intestines. Upon examining the material microscopically, he "saw some plant material on the outside of the intestines." The presence of plant material on the slides was consistent with the victim's having an actual injury to his stomach or intestines. He said that both the injury and the peritonitis would have been treatable with antibiotics and fluids.

Doctor Zimmerman examined the "white stud belt" recovered from the apartment and opined that the belt could have made some of the abrasions he found on the victim's body and agreed that "the small metal areas on the belt . . . could make round scars on the skin." He said that a belt without such studs, "especially if it hit with the edge of the belt, . . . could make linear contusions." Doctor Zimmerman testified that the impact of the knuckles of a closed fist could have made the round contusions he observed on the victim's abdomen. He agreed that blunt force to the mouth could have caused the injuries inside the victim's mouth.

Doctor Zimmerman agreed that there were abrasions and contusions across a majority of the victim's body but testified that, with prompt medical treatment of the injuries, the victim could have survived. The failure to obtain prompt medical care contributed to the victim's death. Ultimately, he determined the cause of death to be multiple blunt force trauma.

During cross-examination, Doctor Zimmerman conceded that he was unable to identify a tear in the victim's small intestine, but he said that "there had to have been one in order for that plant material to be there." He added that, "[w]ith all the contusions on the abdomen, some sort of blunt trauma of the abdomen would have caused" the tear that led to the victim's death. He acknowledged that "[a]n infection in the intestines could cause a tear of the abdomen" but said that he "didn't see any evidence of that. By infection, I mean like a bacterial or a viral infection inside the intestines. I didn't see any evidence of that under the microscope." Doctor Zimmerman clarified that the belt with studs on it could have caused "some of the bruising" and "some of those linear abrasions" but not the internal injuries. He explained, "[I]f a belt were used to impart that much force on an abdomen to cause those internal injuries, it would leave more than just superficial abrasions on the skin." He acknowledged that although a simple slip and fall would have been insufficient, running into the corner of a table "could make a deep enough injury to cause a subgaleal hemorrhage." Finally, he said

that the fluid in the victim's lungs could be attributed to the services he received at the hospital but that it was not "very likely" that any of his injuries were sustained in the course of treatment.

Tara Steele-Giles, Director at Gartland Child Development Center ("the Center"), testified that the victim enrolled in January 2013 and attended somewhat sporadically until April 22, 2013. Ms. Steele-Giles described the victim as "a very good kid" who understood enough to follow directions but had difficulty expressing himself. The victim appeared to have "kind of like a speech problem," so Ms. Steele-Giles worked with him one-on-one "to get a little bit of understanding." She tried to speak with Ms. Hunter about the victim's issues "a few times," but "[a] lot of times it was, you know, like brush off, like ignore type of thing." Eventually, however, she spoke to Ms. Hunter and "arranged to get help for the child." That help was provided "one time at our facility. And the other times they could not get in contact with" Ms. Hunter.

Ms. Steele-Giles recalled that the victim "didn't want to go" when his mother came to pick him up and would cling to Ms. Steele-Giles when it got time to leave, which, in hindsight, "was a red flag." She said that she did not take any action at the time because, given his limited ability to communicate, she could not be sure why the victim did not want to leave. Because the victim was potty trained and attended school in the winter and spring, Ms. Steele-Giles had no occasion to view the victim's bare legs.

The Center did not use corporal punishment, and, on those occasions when one child harmed another, the Center created an incident report with one copy for the parents and another for the Center. The victim was involved in incidents on March 25 and 26, 2013, that involved his hitting other children. On one occasion, the victim stood on a chair and screamed. On another he threw rocks on the playground. On April 4, 2013, the victim was placed in timeout for spitting on the table. The victim's file contained no documented cases of the victim's injuring himself at the Center. After the victim was absent on April 23, 2013, Ms. Steele-Giles attempted to telephone Ms. Hunter on April 24, 2013. She left a message but never received a return call.

Ms. Steele-Giles testified that she interacted often with the defendant, saying, "If I needed to ask anything, a lot of times Donald would speak for [Ms. Hunter]. And I didn't think nothing bad because I actually thought he was the father." She said that the defendant and Ms. Hunter often arrived together to drop off and pick up the victim and that Ms. Hunter had listed the defendant's name in the portion of the application for naming the victim's father.

Forensic testing on the orange polo shirt and three pieces of belt collected from the scene established that reddish-brown stains on those items was the victim's blood.

The defendant did not testify but did choose to present proof.

Nashville Fire Department paramedic Richard Carney testified that he had no independent recollection of having treated the victim but acknowledged that the report he prepared following the incident did not include any notation that the victim had a torn frenulum. During cross-examination, however, Mr. Carney maintained that he could not have torn the victim's frenulum during the intubation procedure "because I'm nowhere near that."

Psychologist and professional counselor Bernard Charles Ihrig, who was tendered as an expert in the field of child psychology, testified that he had reviewed the victim's medical records from Vanderbilt, Meharry, and Centerstone. He said that Meharry Doctor Vanessa Elliott had given the victim a "somewhat provisional" diagnosis of "potential global developmental delay or other developmental delay" in 2012 based upon answers provided by the co-defendant. He said that a diagnosis "of global developmental delay is highly associated with self-injurious behavior."

During cross-examination, Doctor Ihrig admitted that he had never seen any images of the injuries inflicted on the victim and could not make a diagnosis of the cause of those injuries. He conceded that he did not interview any witnesses. Doctor Ihrig also admitted that the victim was not ever fully assessed for a developmental delay and that "[w]hat was done was superficial." Doctor Ihrig acknowledged that Doctor Elliot had also given the victim a provisional diagnosis of Oppositional Defiant Disorder, but Doctor Ihrig chose not to include that diagnosis in his report because it was his opinion that such a diagnosis was "completely inappropriate" for a child of the victim's age. Doctor Ihrig testified that inflicting corporal punishment on a child with a developmental issue "would exacerbate the symptoms that the child manifests," causing "[i]ncreased aggression, more tearfulness, slowed development, . . . lack of responsiveness to the environment. It would be pretty damaging."

In rebuttal, the State offered into evidence a single nurse's report that was included in the victim's medical records from VUMC. The document indicated that the victim's frenulum was torn when he arrived at the hospital.

Based upon this proof, the jury convicted the defendant of one count of facilitation of aggravated child abuse, three counts of aggravated child abuse, one count of aggravated child neglect, one count of facilitation of felony murder in the perpetration

-8-

of aggravated child abuse, and one count of felony murder in the perpetration of aggravated child neglect. The jury found the defendant not guilty of two counts of aggravated child abuse. Following a sentencing hearing, the trial court imposed a total effective sentence of life plus 75 years' imprisonment.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant asserts that the trial court erred by permitting the State to introduce the document from the victim's medical record as rebuttal evidence because the document was not properly authenticated; that the State's election of offenses was insufficient to ensure jury unanimity; that the trial court erred by including "improper language" in its jury instruction regarding criminal responsibility for the conduct of another; that the evidence was insufficient to support his conviction of felony murder; and that the sentence is excessive. We consider each claim in turn.

*I. Rebuttal Evidence*

The defendant contends that the trial court erred by permitting the State to introduce as rebuttal evidence a nurse's report from the victim's medical records, arguing that the State failed to comply with Tennessee Rule of Evidence 902 for the admission of self-authenticating documents by failing to give pretrial notice that it intended to offer the document into evidence. The State asserts that the defendant waived consideration of this issue by failing to raise an authentication objection at trial and that, in the alternative, any error in the admission of this evidence was harmless.

After the defense closed its proof, the State indicated that it intended to introduce the nurse's triage notes from the victim's arrival at VUMC to show that the victim had a torn frenulum when he arrived at the hospital. The defendant objected to the record as irrelevant, noting that there was no evidence of "what happened once he got to the hospital or how it got torn. There's nobody here from Vanderbilt to say what the process was getting him out of the ambulance and how he got to the nurse's station." The court allowed the State to introduce the document without the benefit of a witness, noting that the document, as part of a medical record accompanied by an affidavit of the records custodian, was self-authenticating.

As the State correctly points out, the defendant did not object to the document or the procedure for its admission on grounds that either violated the terms of evidence rule 902. Instead, the defendant argued that the document was irrelevant. Consequently, we agree with the State that the defendant has waived review of this issue. *See State v. Dooley*, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000) (appellant's changing theory on appeal from that espoused at the trial court "constitutes a waiver of the issue"). Additionally, we agree with the State that, even assuming that the trial court erred by

admitting the record, the error would have been harmless in light of the evidence of the defendant's guilt. This is particularly true given that Mr. Carney did not testify that the victim did not have a torn frenulum and instead testified that he had not included a torn frenulum in his notes. Moreover, the injury to the victim's frenulum, while certainly painful to the victim, was minor in comparison to the magnitude and multitude of the other injuries inflicted upon the victim.

## II. Election of Offenses

The defendant, conceding that he failed to lodge a contemporaneous objection at trial, asserts that the election of offenses provided by the State with regard to Counts 1, 2, 3, and 6 of the indictment "was insufficiently distinct to [e]nsure that the jury's verdict rested on a common set of facts" and that this court should recognize the error as plain despite his failure to challenge the election at trial. The State contends that the defendant waived plenary consideration of the issue by failing to challenge the election at trial and argues that, because the election of offenses was sufficient, the defendant is not entitled to relief via plain error review.

At the conclusion of the State's case-in-chief, the trial court explained the importance of the State's election of offenses to the jury: "Because it's very important because you have to reach a unanimous verdict. We can't have you all deciding, well, maybe this happened or this happened, and it's all mixed up. We have to know exactly what it is you're determining on each count." The State then read into the record the following election of offenses:

> Election of offenses, Count 1 of the indictment alleges an act of aggravated child abuse and refers to the following conduct: While living with [the victim] between the dates of April 20th and April 26th, 2013, the defendant caused fatal abdominal trauma to [the victim] including acute bruising to his abdomen, and internal laceration, and peritonitis.
>
> Count 2 of the indictment alleges an act of aggravated child abuse and refers to the following conduct: While living with [the victim] between the dates of April 20th, 2013, and April 26th, 2013, the defendant caused multiple injuries to the head, and mouth, torso, limbs, back, buttocks, and genitals of [the victim]. Some of the injuries were pattern shaped and consistent with the use of a belt.

-10-

Count 3 of the indictment alleges an act of aggravated child abuse and refers to the following conduct: While living with [the victim] between the dates of April 20th, 2013, and April 26th, 2013, the defendant caused pattern-shaped injuries on the body of [the victim] with a belt or other object.

Count 4 of the indictment alleges an act of aggravated child abuse and refers to the following conduct: While living with [the victim] between the dates of October 2nd, 2012, and April 19th, 2013, the defendant whipped or beat [the victim] in a manner that resulted in permanent scar marks being left on his body.

Count 5 of the indictment alleges an act of aggravated child abuse and refers to the following conduct: While living with [the victim] between the dates of October 2nd, 2012, and April 19th, 2013, the defendant whipped [the victim] with a belt or unknown object in a manner than resulted in permanent scar marks being left on his body.

Count 6 of the indictment alleges an act of aggravated child abuse and refers to the following conduct: While living with [the victim] between the dates of October 2nd, 2012, and April 26th, 2013, the defendant abused [the victim] in a manner that was especially heinous, atrocious, or cruel, or involved torture as evidenced by the testimony of Dr. David Zimmerman, the autopsy report, and multiple photographs.

Count 7 of the indictment alleges an act of aggravated child neglect and refers to the following conduct: While living with [the victim] between the dates of October 2nd, 2012, and April 26th, 2013, the defendant neglected the welfare of [the victim] on an ongoing basis and failed to seek prompt medical attention for the fatal abdominal trauma [the victim] sustained of which the defendant was aware. Delay in seeking medical attention and overall neglect and care allowed the infection in the abdomen to progressively worsen to the point where [the victim] died.

Count 8 of the indictment alleges an act of felony murder and refers to the following conduct: On or about April 26th, 2013, [the victim] died as a result of blunt abdominal trauma inflicted by the defendant.

Count 9 of the indictment alleges an act of felony murder and refers to the following conduct: On or about April 26th, 2013, [the victim] died from peritonitis from abdominal injuries which could have been treated with prompt medical attention as evidenced by the testimony of Dr. David Zimmerman. Delay in seeking medical attention allowed the infection in the abdomen to progressively worsen to the point where [the victim] died.

Within the defendant's challenge to the State's election of offenses we actually perceive two separate but related issues: (1) whether the State's election of offenses was sufficient to protect the defendant's state constitutional right to a unanimous jury verdict and (2) whether the multiple child abuse convictions in this case violate the defendant's state and federal constitutional protections against double jeopardy. We consider each claim in turn.

*A. Jury Unanimity*

When the evidence adduced at trial indicates that the defendant has committed more offenses against the victim than were charged in the indictment, the State must elect the facts upon which it intends to rely for each count of the indictment in order to protect "the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001); *see also State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). The election requirement arises most often when a defendant is alleged to have performed multiple sexual acts over a lengthy period of time against young children who are unable to provide the exact date on which any one act occurred. *See, e.g., Johnson*, 53 S.W.3d at 631; *Brown*, 992 S.W.2d at 391-92. "Any description that will identify the prosecuted offense for the jury is sufficient. In fulfilling its obligation . . . to ensure that an election occurs, the trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993) (internal citations and footnote omitted).

The defendant concedes that he failed to lodge a contemporaneous objection to the sufficiency of the State's election of offenses, but he insists that he has satisfied the requirements for plain error review. Whether properly assigned or not, this court may, "[w]hen necessary to do substantial justice, . . . consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial." Tenn. R. App. P. 36(b). This court will grant relief for plain error only when:

> (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). The party claiming plain error bears the burden of satisfying all five criteria as a prerequisite to plain error review. *See id.* "Because the election requirement safeguards a criminal defendant's fundamental, constitutional right to a unanimous jury verdict, errors pertaining to the sufficiency of the prosecution's election are subject to plain error review." *State v. Knowles*, 470 S.W.3d 416, 424 (Tenn. 2015) (citing *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1975); *Kendrick*, 38 S.W.3d at 567; *State v. Walton*, 958 S.W.2d 724, 726-27 (Tenn. 1997); *State v. Clabo*, 905 S.W.2d 197, 204 (Tenn. Crim. App. 1995)). "When applying plain error review," in the context of a challenge to the State's election of offenses, the reviewing court "must bear in mind that the election requirement is merely a means by which to protect the right to a unanimous verdict. There is no right to a perfect election, and . . . the election requirement may be satisfied in a variety of ways." *Knowles*, 470 S.W.3d at 424. Importantly, "the election requirement applies to offenses, not to the facts supporting each element of the offense." *Id.*

In this case, the defendant was charged in Counts 1 thru 6 with aggravated child abuse. Code section 39-15-402 defines that offense:

> (a) A person commits the offense of aggravated child abuse . . . who commits child abuse, as defined in § 39-15-401(a) . . . and:
>
> (1) The act of abuse . . . results in serious bodily injury to the child;

-13-

(2) A deadly weapon, dangerous instrumentality, controlled substance or controlled substance analogue is used to accomplish the act of abuse . . .;

(3) The act of abuse . . . was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim; or

. . . .

. . . .

(c) "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects and acts of female genital mutilation as defined in § 39-13-110.

(d) A "dangerous instrumentality" is any item that, in the manner of its use or intended use as applied to a child, is capable of producing serious bodily injury to a child, as serious bodily injury to a child is defined in this section.

T.C.A. § 39-15-402(a), (c), (d). Code section 39-15-401 defines the offense of child abuse:

(a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that if the abused child is eight (8) years of age or less, the penalty is a Class D felony.

T.C.A. § 39-15-401(a).

A reading of the State's election of offenses establishes that the State attempted to differentiate between the six counts of child abuse charged in this case by using both the injuries inflicted upon the victim and the modalities used to inflict those

-14-

injuries. Thus, the record clearly indicates what happened in the trial court, the first prerequisite to plain error review. *See Knowles*, 470 S.W.3d at 425.

Doctor Zimmerman testified that the victim's abdominal injury could not have been caused by the victim's having been struck by a belt. Similarly, the evidence established that the injury to the victim's head that caused the subgaleal hemorrhage was not caused by a belt. In light of this evidence, the method of differentiation utilized by the State was sufficient to ensure that the jurors utilized the same set of factors to convict the defendant of aggravated child abuse as charged in Count 2 (injury "to the head, and mouth, torso, limbs, back, buttocks, and genitals" only some of which "were pattern shaped and consistent with the use of a belt") and Count 3 ("the defendant caused pattern-shaped injuries . . . with a belt or other object) and of facilitation of aggravated child abuse in Count 1 ("fatal abdominal trauma including acute bruising to his abdomen, and internal laceration, and peritonitis"). Count 7, which charged aggravated child neglect for the defendant's failure to seek medical attention for the victim's abdominal injury, was likewise sufficiently distinguishable from the other charged offenses. Because no error attends the State's election of offenses for Counts 1, 2, 3, and 7, the defendant cannot establish the remaining prerequisites to plain error review. *See id.*

The election for Count 6, however, contains no set of facts upon which the State intended the jury to rely for the conviction in that count, and no evidence would support that conviction that would not also support the convictions in Counts 1, 2, and 3. Instead, that election limits the jury's consideration to the defendant's abusing the victim "in a manner that was especially heinous, atrocious, or cruel, or involved torture as evidenced by the testimony of Dr. David Zimmerman, the autopsy report, and multiple photographs." As indicated, Doctor Zimmerman's testimony established that the victim suffered a variety of injuries across the whole of his body and that the injuries were inflicted at different times. Because the time frame alleged in Count 6 is broader than that alleged in Counts 1-3, the jury could have rested its verdict in that count upon the victim's older injuries. Such a conclusion, however, would be speculative, at best, given that the State's election for Count 6 did not direct the jury's attention to the victim's older injuries. Instead, the State's election for Counts 4 and 5 specifically directed the jury's attention to the victim's older injuries. Under these circumstances, the election for Count 6 contained insufficient information, such as a specific date, modality of abuse, or significant detail to allow the jury to differentiate the act of abuse alleged in that count from the offenses described in Counts 1, 2, and 3.

Moreover, this is not a situation in which a general verdict of guilty of multiple offenses is supported by "general evidence" of a pattern of abuse. In *State v. Qualls*, our supreme court held

-15-

that in generic evidence cases the prosecution need not elect a specific criminal act or incident as the basis of a conviction for each charge. Instead, the election doctrine may be satisfied in generic evidence cases by the trial court['s] providing a modified unanimity instruction that allows a conviction only if the jury unanimously agrees the defendant committed all the acts described by the victim.

*State v. Qualls*, 482 S.W.3d 1, 17 (Tenn. 2016). Although the evidence arguably established that either the defendant or Ms. Hunter, or both, abused the victim over a period of time, the State did not ask the trial court for a modified unanimity instruction. Additionally, the jury acquitted the defendant of the charges in Counts 4 and 5 and convicted him of the lesser included offense of facilitation in Counts 1 and 8, indicating that this is not a "generic evidence" case for which an election was not necessary.

The State's election did not contain sufficient information to safeguard the defendant's state constitutional right to a unanimous verdict in Count 6, which error "breached a clear and unequivocal rule of law" and "adversely affected a substantial right" of the defendant. *Knowles*, 470 S.W.3d at 425. Additionally, no evidence suggests that the defendant waived the error for tactical purposes. Finally, based upon the foregoing analysis, we conclude that the deficiency in the election for Count 6 was not harmless beyond a reasonable doubt, *see State v. Shelton*, 851 S.W.2d 134, 137-38 (Tenn. 1993), but was, instead, "so significant that it 'probably changed the outcome of the trial,'" *Knowles*, 470 S.W.3d at 425 (citations omitted). Consequently, we reverse the defendant's conviction of aggravated child abuse in Count 6 and remand that count for a new trial. Upon retrial, the State must take pains to confine the proof to a single set of facts different from those used to support the convictions in Counts 1-3 in order to avoid violating principles of double jeopardy.

## B. Double Jeopardy

Within the defendant's challenge to the election of offenses, we recognize a claim that the State's election of offenses failed to protect him against double jeopardy. Again, because the defendant failed to raise the issue below, we must determine whether any error can be classified as plain.

Both the federal and state constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offence." U.S. Const. Amend. V; Tenn. Const. art. 1, sec. 10. The state and federal provisions, which are quite similar in verbiage, have been given identical interpretations. *See State v. Waterhouse*, 8 Tenn. (1 Mart. & Yer.) 278, 284 (1827) ("[W]e did not feel ourselves warranted in giving [the

double jeopardy provision of the state constitution] a construction different from that given to the constitution of the United States, by the tribunal possessing the power, (and of pre-eminent qualifications) to fix the construction of that instrument.").  The United States Supreme Court has observed of the double jeopardy clause:

> Our cases have recognized that the Clause embodies two vitally important interests.  The first is the "deeply ingrained" principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."  The second interest is the preservation of "the finality of judgments."

*Yeager v. United States*, 557 U.S. 110, 117-18 (2009) (citations omitted).  To these ends, our state supreme court has observed that the Double Jeopardy Clause provides "three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense."  *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

The defendant's claim involves the third category of double jeopardy protection, multiple punishments for a single offense.  "[I]n single prosecution cases, the double jeopardy prohibition against multiple punishments functions to prevent prosecutors and courts from exceeding the punishment legislatively authorized."  *Id.* at 542.  Claims of this type "ordinarily fall into one of two categories, frequently referred to as 'unit-of-prosecution' and 'multiple description' claims."  *Id.* at 543.  So-called "unit-of-prosecution" claims arise "when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the 'same offense.'"  *Id.*  Reference to the test developed in *Blockburger v. United States*, that is, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not," *see Blockburger v. United States*, 284 U.S. 299, 304 (1932), is not necessary when multiple violations of a single statutory provision have been alleged.  Instead, "[w]hen addressing unit-of-prosecution claims, courts must determine 'what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment.'"  *Watkins*, 362 S.W.3d at 543 (citations omitted).  To determine the appropriate unit of prosecution, "we first examine the statute in question to determine if the statutory unit of prosecution

-17-

has been expressly identified." *State v. Smith*, 436 S.W.3d 751, 768 (Tenn. 2014) (citations omitted). "If the unit of prosecution is clear from the statute, there is no need to review the history of the statute and other legislative history." *State v. Hogg*, 448 S.W.3d 877, 886 (Tenn. 2014). If the unit of prosecution is not clear from the plain language of the statute, "we review the history of the statute. Finally, we perform a factual analysis as to the unit of prosecution." *Smith*, 436 S.W.3d at 768. A reviewing court must "apply the 'rule of lenity' when resolving unit-of-prosecution claims, meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution." *Watkins*, 362 S.W.3d at 543 (citations omitted).

Whether multiple convictions violate double jeopardy principles is a mixed question of law and fact that we review de novo with no presumption of correctness. *Smith*, 436 S.W.3d at 766 (Tenn. 2014) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

As charged in this case, aggravated child abuse is child abuse when "(1) [t]he act of abuse, neglect or endangerment results in serious bodily injury to the child; [or] (2) [a] deadly weapon, dangerous instrumentality, controlled substance or controlled substance analogue is used to accomplish the act of abuse, neglect or endangerment." T.C.A. § 39-15-402(a)(1)-(2). In *State v. Thomas Bethel Hendrix*, following an examination of the applicable statutes, this court concluded:

> Like the aggravated assault statute, we conclude that the aggravated child abuse statute focuses on the act resulting in injury and that the legislature did not intend for defendants charged with aggravated child abuse to be punished separately for each individual injury. Instead, the unit of prosecution is the act that caused the injury.

*State v. Thomas Bethel Hendrix*, No. M2017-00386-CCA-R3-CD, slip op. at 23 (Tenn. Crim. App., Nashville, May 14, 2019). We agree with this analysis and conclude that the proper unit of prosecution for aggravated child abuse offenses is "the act of abuse" rather than the injury inflicted.

Applying "the act of abuse" as the unit of prosecution, we consider whether the convictions in Counts 1-3, viewed in light of the State's election of offenses, violated double jeopardy principles. As stated above, the State's election of offenses for Count 1 limited the jury's consideration to the act of abuse that caused the abdominal injury that eventually led to the victim's death. Because Doctor Zimmerman testified that this injury could not have been caused by the victim's having been struck by a belt or other object,

-18-

the act of abuse that caused the fatal abdominal injury was a separate and distinct act from the acts of abuse alleged in Counts 2 and 3. Nothing, however, suggests that the acts alleged in Counts 2 and 3 were separate, distinct acts of abuse. Instead, the two counts charge the same act of abuse via different modalities, with Count 2 charging aggravated child abuse via the "serious bodily injury" aggravator, *see* T.C.A. § 39-15-402(a)(1), and Count 3 charging aggravated child abuse via the "dangerous instrumentality" aggravator, *see id.* § 39-15-402(a)(2). Consequently, dual convictions for aggravated child abuse in Counts 2 and 3 violate double jeopardy principles, and the imposition of dual convictions for these offenses rises to the level of plain error.

The remedy, however, is not dismissal of one of the counts or a remand for a new trial but a merger of the jury verdicts for those counts. *See Thomas Bethel Hendrix*, slip op. at 21 ("It is well settled in Tennessee that, under certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications." (quoting *State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015)). Although the sentences for the defendant's convictions in Counts 2 and 3 are aligned concurrently, the Supreme Court has held that where separate convictions violate double jeopardy principles because the legislature has not authorized multiple punishments, the imposition of concurrent sentences does not alleviate the violation:

> "The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence. The separate conviction, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. For example, the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction. *See Benton v. Maryland*, 395 U.S. 784, 790-791 (1969); *Sibron v. New York*, 392 U.S. 40, 54-56 (1968). Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment."

*Rutledge v. United States*, 517 U.S. 292, 302 (1996) (quoting *Ball v. United States*, 470 U.S. 856, 864-65 (1985)). In consequence, we remand the case for the entry of corrected judgment forms for Counts 2 and 3 reflecting the merger of these convictions.[1]

---

[1] Although the defendant mentions in passing the effect of the State's election of offenses on his

### III. Criminal Responsibility Instruction

The defendant asserts that the trial court erred by including "improper language" in its jury instruction regarding criminal responsibility for the conduct of another. Specifically, he argues that the trial court should not have provided a jury instruction regarding the theory of criminal responsibility found in Code section 39-11-402(3) because no proof established that he stood in loco parentis to the victim. The State contends that the instruction was appropriate.

The defendant's constitutional right to trial by jury, *see* U.S. Const. amend. VI; Tenn. Const. art. 1, § 6, encompasses the right to a correct and complete charge of the law, *see State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). To this end, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see also* Tenn. R. Crim. P. 30. The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction in a given case is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001). A jury instruction may be classified as "prejudicially erroneous" only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)).

At trial, the State asked the trial court to instruct the jury on the theories of criminal responsibility for the conduct of another found in Code sections 39-11-402(2) and (3), which provided:

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the

---

convictions of felony murder in Count 9 and facilitation of felony murder in Count 8, we note that our supreme court has specifically held "that the legislative intent to allow cumulative punishment" for aggravated child abuse or neglect and felony murder in the perpetration of those offenses "is clear. . . . and that dual convictions are permissible in this context." *State v. Godsey*, 60 S.W.3d 759, 778 (Tenn. 2001).

-20-

offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

T.C.A. § 39-11-402(2)-(3).  The defendant did not object to an instruction pursuant to subsection (2) but did object to the criminal responsibility instruction based upon his having "voluntarily undertaken a duty to protect the child by assuming the role of custodian."  He argued, as he does on appeal, that the State had not presented any evidence to establish that he had voluntarily undertaken the role of caretaker.  The trial court disagreed and instructed the jury as follows:

> The defendant is criminally responsible as a party to an offense if the offense was committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or by both.  Each party to the offense may be charged with the commission of the offense.
>
> The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense.
>
> The defendant is criminally responsible for an offense committed by the conduct of another if, having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the defendant fail[s] to make a reasonable effort to prevent commission of the offense.
>
> Mere presence is not sufficient to find a defendant guilty for being criminally responsible for an offense committed by the conduct of another.  However, presence of the defendant is not required.  Before you find the defendant

-21-

guilty of being criminally responsible for the conduct of another, you must find that the essential elements have been proven by the State beyond a reasonable doubt.

The trial court's instruction was legally accurate, as the defendant concedes, so we turn to the propriety of its administration under the facts of this case.

"[C]riminal responsibility is not a separate, distinct crime" but is instead "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Criminal responsibility "is a codification of the common-law theories of aiding and abetting and accessories before the fact." *Id.* at 171 (citing *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Criminal responsibility "requires that a defendant act with a culpable mental state, [i.e.], the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *Carson*, 950 S.W.2d at 954 (quoting T.C.A. § 39-11-402(2) (1991)).

For criminal liability to attach under a theory of criminal responsibility based upon the failure to prevent commission of the crime, the State must establish that the defendant had a legal, as opposed to moral, duty to prevent the offense. Such a duty may be imposed by law or voluntarily assumed. *See* T.C.A. § 39-11-402(3). Generally, a person who "has assumed the traditional obligations of a parent without a formal adoption," is said to stand in loco parentis, or "in the place of a parent." *State v. Sherman*, 266 S.W.3d 395, 405 (Tenn. 2008) (quoting *Geibe v. Geibe*, 571 N.W.2d 774, 780-81 (Minn. Ct. App. 1997)). "When one establishes an in loco parentis relationship, that person assumes both duties and interests with regard to a child." *Sherman*, 266 S.W.3d at 406 (citing *Vol. State Life Ins. Co. v. Pioneer Bank*, 327 S.W.2d 59, 62 (Tenn. Ct. App. 1959)). The key element to determining the application of the doctrine "is one of intent—whether the adult intended to assume parental duties." *See Sherman*, 266 S.W.3d at 406 (citations omitted). "A fact-finder may infer intent from circumstantial evidence," *see id.* (citing *McConnico v. Third Nat'l Bank*, 499 S.W.2d 874, 885 (Tenn. 1973)), "whether a person had the intent to establish an in loco parentis relationship may include the child's age, the child's dependence upon the person claimed to be in loco parentis, and whether that person supports the child and exercises the duties and obligations of a natural parent," *see Sherman*, 266 S.W.3d at 406-07 (citing *Gritzner v. Michael R.*, 611 N.W.2d 906, 919-20 (Wis. 2000)).

The defendant contends that the State failed to establish that he voluntarily assumed a duty to prevent the abuse of the victim in this case. The evidence adduced at

trial, however, established that the defendant assumed the role of the victim's father. His name was listed in the father's portion of the victim's school enrollment form, and Ms. Steele-Giles testified that she communicated most often with the defendant regarding the victim's behavior at school. The defendant was present for school drop off and pick up, and, as evidenced by the recorded telephone conversations, he undertook the discipline of the victim by spanking him. On the day of the victim's death, the defendant went to the store to get juice for the victim and helped Ms. Hunter bathe the victim. Under these circumstances, the trial court properly instructed the jury on the law of criminal responsibility.

*IV. Sufficiency*

The defendant also challenges the sufficiency of the convicting evidence for his conviction of felony murder in the perpetration of aggravated child neglect and his conviction of facilitation of felony murder in the perpetration of aggravated child abuse. He argues that the error relative to the election of offenses for Counts 1-3 and 6-7 "calls into question the basis for conviction in counts 8 and 9," asserting that "[i]f the jury could not be certain [of] the facts that led to the conviction . . . as it relates to the underlying felony murder convictions, then the convictions for the felony murder counts are, themselves, infirm as well." He also contends that the "erroneous jury instruction" on criminal responsibility "makes the convictions in Counts 8 and 9 infirm," claiming that "if [the defendant's] criminal responsibility for the conduct of Ms. Hunter, as assigned to him improperly by the trial court, is the basis, then it is an erroneous basis for convictions in Counts 8 and 9." The State asserts that the evidence is sufficient.

Initially, we note that the defendant failed to support his argument with either citations to the record or relevant authorities. In consequence, he has waived our consideration of his challenge to the sufficiency of the evidence. *See* Tenn. Ct. Crim. App. R. 10(b). Moreover, the defendant's challenge is not so much a challenge to the sufficiency of the convicting evidence as it is a repetition of the arguments already made coupled with the defendant's attempt to shoehorn those claims into a sufficiency challenge. Finally, and perhaps most importantly, the record establishes that the evidence adduced at trial was more than sufficient to support the defendant's convictions of facilitation of felony murder in the perpetration of aggravated child abuse and felony murder in the perpetration of aggravated child neglect.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh

the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant was charged in Count 8 with felony murder in the perpetration of aggravated child abuse and in Count 9 with felony murder in the perpetration of aggravated child neglect. T.C.A. § 39-13-202(a)(2) ("First degree murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse, aggravated child neglect . . . ."). The jury convicted him as charged of felony murder in Count 9 but of the lesser included offense of facilitation of felony murder in Count 8.

The three-year-old victim was beaten to death. Doctor Zimmerman's testimony and the photographs admitted into evidence established that the victim's small body was covered in bruises, abrasions, and scars that evinced an ongoing period of abuse. Doctor Zimmerman testified that small-dot patterned injuries could have been inflicted by the white stud belt that was found to be stained with the victim's blood. Linear pattern bruises and abrasions could have been inflicted by a belt. A bruise to the victim's abdomen appeared to match the pattern of a closed fist, and Doctor Zimmerman testified that the victim's peritonitis was the result of a blow severe enough to create a tear in the victim's intestines or stomach. The evidence established that the defendant and Ms. Hunter were alone with the victim when he died, and the defendant admitted in a telephone call that he had "whooped" the victim and that the victim had been hit "on Wednesday." This evidence was sufficient to support the defendant's convictions either as the principal offender, or as criminally responsible for the conduct of Ms. Hunter, and the jury was not required to specify which.

*V. Sentencing*

The defendant asserts that the total effective sentence of life plus 75 years is excessive, arguing that the trial court misapplied certain enhancement factors and erroneously concluded that consecutive sentences were warranted in this case. The State contends that the sentence was warranted.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our

-24-

Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). The standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).

In *State v. Wilkerson*, the supreme court held that the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct before utilizing the "dangerous offender" category to impose consecutive sentencing, *see State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995), and "[t]he adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement," *Pollard*, 432 S.W.3d at 863.

The only live testimony at the sentencing hearing came from the defendant's sister, Victoria Harris, who testified that the defendant was one of 21 children and that he had been placed in remedial classes in school. She added, "And I only know that because half of us was in remedial classes, which basically just means that we couldn't learn on a task like everyone else so we was put in a special class so we could learn at our own pace."

In arriving at the individual terms of imprisonment, the trial court applied enhancement factor (1), that the defendant had criminal convictions in addition to those necessary to establish the appropriate range, and factor (8), that the defendant failed to comply with a sentence involving release into the community, to all of the defendant's convictions in this case. *See* T.C.A. § 40-35-114(1), (8). The court applied enhancement factor (2), that the defendant was a leader in the commission of the offenses, to the convictions in Counts 2, 3, 6, and 7. *See id.* § 40-35-114(2). The court found that the victim was particularly vulnerable due to his mental disabilities and applied enhancement factor (4) to all but the conviction of felony murder in Count 9. Finally, the court found that the defendant abused a position of private trust when committing the offenses in Counts 1-3 and 6 and applied enhancement factor (14) to the sentences for those convictions. The court found that no mitigating factors applied.

The trial court also ordered partially consecutive sentencing based upon its finding that the defendant was a dangerous offender:

> When you consider what we heard about this child's life, the fact that he was severely beaten and if you look at those pictures more than Monday through Friday, this went on for a very long time. That child died a very painful death. It was especially heinous, atrocious, and cruel. It involved the infliction of torture to that child. And even while he was dying he was not taken to a hospital, though, [the defendant] did try to give CPR long after it was too late. I find that . . . some consecutive sentences in this case is appropriate because I find that an aggregate term of consecutive sentence reasonably relates to the severity of the offenses. And it's necessary in order to protect the public from further serious criminal conduct of the defendant. So he has a life sentence plus. On Counts 1, 2, and 3 those are going to run concurrent with each other because they are involving the same kind of set of things or just a different version of the aggravated child abuse. Counts 6 and 7, however, are child abuse. Count 6 is the . . . heinous, atrocious, and cruel involving the infliction of torture. That's going to be consecutive to counts 1, 2, and 3. Count 7 is going to be consecutive, the aggravated child neglect, . . . and then Count 8 is going to merge with Count 9. So we have a total of life plus seventy-five years. The seventy-five years will be at eighty-five percent.

The court imposed the following sentences:

| Count | Sentence | Alignment |
|-------|----------|-----------|
| 1 | 12 years | Concurrent with Counts 2 and 3 Consecutive to Count 9 |
| 2 | 25 years | Concurrent with Counts 1 and 3 Consecutive to Count 9 |
| 3 | 25 years | Concurrent with Counts 1 and 2 Consecutive to Count 9 |
| 6 | 25 years | Consecutive to Counts 1-3 and 9 |
| 7 | 25 years | Consecutive to Counts 1-3, 6, and 9 |
| 8 | 25 years | Merged with Count 9 |
| 9 | Life | |

With regard to the application of the enhancement and mitigating factors, we conclude that the trial court did not abuse its discretion. The factual findings supporting the court's application of the factors are fully supported by the record. With regard to the imposition of consecutive sentences, we similarly conclude that the trial court did not abuse its discretion. The court, noting the temporal duration and physical severity of the abuse inflicted upon the victim, made the necessary findings under *Wilkerson* to impose consecutive sentences based upon the defendant's status as a dangerous offender.

*Conclusion*

Based upon the foregoing analysis, we affirm the defendant's convictions and the accompanying sentences in Counts 1 (facilitation of aggravated child abuse), 2 (aggravated child abuse), 3 (aggravated child abuse), 7 (aggravated child neglect), 8 (facilitation of felony murder in the perpetration of aggravated child abuse), and 9 (felony murder in the perpetration of aggravated child neglect). We also affirm the imposition of consecutive sentences. Because the defendant's convictions in Counts 2 and 3 violate double jeopardy principles, the trial court must enter corrected judgment forms reflecting that those convictions are merged. Because the State's election of offenses for Count 6 was insufficient to ensure jury unanimity for that count of the indictment, the defendant's conviction of aggravated child abuse in Count 6 is reversed and remanded for a new trial.

_____
JAMES CURWOOD WITT, JR., JUDGE